SINCLAIR *v.* FORTENBERRY.

Feb. 4, 1952.

No. 38405 (56 So. (2d) 697)

Satterfield, Ewing, Williams & Shell, for appellant.

Henry Mounger and Roy J. Goss, for appellee.

**Kyle, J.**

This is a primary election contest case growing out of the Democratic Primary election held on August 28, 1951, for the election of a supervisor for District No. 2 of Marion County. Sheldon L. Fortenberry and Nooks Sinclair were the candidates for the office of supervisor. After the election returns had been canvassed it appeared that Fortenberry had received 667 votes and that Sinclair had received 606 votes, which indicated a majority of 61 votes for Fortenberry; and Fortenberry was declared the nominee by the County Democratic Executive Committee.

On September 15, 1951, Sinclair filed a petition with the County Democratic Executive Committee contesting the election of Fortenberry. The committee met on September 27 to consider Sinclair's contest, but adjourned without disposing of the contest. Another meeting was held on a later date; but the committee declined to proceed with the hearing of testimony, and, upon motion duly made, reaffirmed its former action declaring Fortenberry to be the nominee. On October 9 Sinclair filed a petition for a judicial review, as provided for in the Corrupt Practices Act. Chapter 19, Laws of Mississippi Extraordinary Session, 1935. The Chief Justice of

this Court designated the Honorable J. F. Guynes, Chancellor of the Fifteenth Chancery District, to hear and determine the contest. The hearing was begun on October 25 and was completed on November 9. The three county election commissioners attended the hearing and took part in the proceedings; but before the hearing had been completed one of the county election commissioners became ill and was unable to attend during the last days of the hearing or to take part in the final determination of the contest.

There were four voting precincts in the supervisor's district. The election contest involves alleged irregularities in the holding of the election and the counting of the votes in the Goss voting precinct and in the Cedar Grove voting precinct. No questions have been raised as to the manner of holding the election or the counting of the votes in the Carley voting precinct or the Hathorn voting precinct.

The special tribunal found that in the Goss voting precinct Fortenberry received 159 votes and Sinclair 87 votes, not including the absent voters' ballots; that Fortenberry received 18 votes cast by absent voters' ballots, and that Sinclair received 10 votes cast by absent voters' ballots. The special tribunal found that the applications for absent voters' ballots and the envelopes with the statutory affidavits had been lost or destroyed and not preserved as required by the statute; and the court held that the failure of the election officers to preserve the envelopes with the statutory affidavits destroyed the integrity of the ballots, and that the 28 absent voters' ballots could not be counted. The court also found that 28 other illegal votes had been cast at the Goss precinct by persons who for various reasons were not qualified to vote in the election.

The court found that in the Cedar Grove voting precinct the total number of votes received by Fortenberry was 304, and the total number of votes received by Sinclair was 108. The total number of ballots cast for

Fortenberry, not including the absent voters' ballots, was 245; and the total number of ballots cast for Sinclair, not including the absent voters' ballots, was 92. The court found that six regular ballots, that is to say, ballots other than absent voters' ballots, had been marked in pencil, not indelible, four for Fortenberry and two for Sinclair; and the court held that these ballots should not be counted. The court found that there were three ballots for Sinclair and one for Fortenberry, which were marked "void" and should not be counted. The court found that there were nine ballots which had not been initialed by any manager of the election, seven of which had been cast for Fortenberry and two for Sinclair; and the court held that these ballots should not be counted.

The court found that the number of absent voters' ballots cast for Fortenberry was 59, and that the number of absent voters' ballots cast for Sinclair was 16. The court found that there were 72 applications for absent voters' ballots in the ballot box of the Cedar Grove precinct when the box was opened, but that the envelopes with the statutory affidavits were not found therein; that the envelopes had been left out of the ballot box, when the counting of the ballots had been completed, and were carried by the manager to the circuit clerk after the counting had been completed. The court held that because of the facts above stated the absent voters' ballots had lost their integrity and could not be counted.

The court found that in the Cedar Grove box there were 87 ballots which had been initialed "BA" by the initialing manager, Bill Autry, and that there were 240 ballots initialed "B" by H. O. Breland. The court found that H. O. Breland had been designated as the returning manager for the Cedar Grove box; that prior to the opening of the polls H. O. Breland had been elected by the managers as the initialing manager, but that after the polls had been opened Bill Autry was elected as the initialing manager and served part of the time as initialing manager. The court held that under the Corrupt Practices Act

the returning manager was disqualified from serving as initialing manager; and that the 240 ballots initialed by H. O. Breland were illegal and could not be counted.

The court found that the managers of the election in the Cedar Grove precinct had permitted many irregularities to occur in the voting; that 58 persons had been permitted to vote who were not legally qualified to vote in the election; that it was impossible to ascertain how the 58 illegal voters voted, and that it was therefore impossible to determine the will of the voters in the Cedar Grove precinct. The court was unable to say that the irregularities mentioned were deliberately permitted or engaged in by the managers for the purpose of electing or defeating either candidate, so as to justify the throwing out of the entire box. It was not shown for whom the illegal voters had voted; but the court found that the number of illegal votes cast was sufficient to change the result of the election. The court held that to entitle Sinclair to be declared the nominee it was necessary for him to show by proper proof that the illegal votes were cast for his opponent, and that he had failed to make such proof.

The court therefore ordered that the Cedar Grove box be thrown out because of the failure of the election officers to follow the provisions of the statutes relating to the holding of primary elections, and that a special primary election be held in the Cedar Grove precinct and that new managers be appointed to hold the election.

From the judgment of the special tribunal ordering that a new primary election be held in the Cedar Grove voting precinct on November 14, 1951, with the said Nooks Sinclair and Sheldon L. Fortenberry as the candidates for the office of Supervisor of District No. 2, both parties have prosecuted appeals to this Court.

The contestant, Nooks Sinclair, in his assignment of errors contends (1) that the court erred in failing to declare the contestant the nominee of the Democratic Party for the office of supervisor, and (2) that the court

erred in failing to order a new primary election to be held in the Goss precinct as well as in the Cedar Grove precinct. The contestee, Sheldon L. Fortenberry, who has filed a cross appeal, in his assignment of errors contends (1) that the court erred in ordering a new election in the Cedar Grove precinct, and (2) that the court erred in failing to find that the contestee had been duly nominated for the office of supervisor in the August 28 primary election.

There are three main points which must be considered by us on this appeal in disposing of the above mentioned assignments of error, and in view of the conclusions that we have arrived at on those points it will not be necessary for us to discuss many of the other details of the findings of the special tribunal.

The first point relates to the findings of the special tribunal with reference to the absent voters' ballots cast in the election held in the Goss precinct and the absent voters' ballots cast in the election held in the Cedar Grove precinct. In the Goss precinct 28 absent voters' ballots were cast and in the Cedar Grove precinct 75 absent voters' ballots were cast. The court held that none of these ballots should be counted for the reason that the managers of the election had failed to preserve with the ballots the application affidavits and the envelopes on which the affidavits were made designating the person who was to deliver the absent voters' ballots to the election officers. In the Goss precinct the absent voters' application affidavits and the envelopes had been lost or destroyed by the managers, and for that reason had not been put in the ballot box at the close of the polls. In the Cedar Grove precinct 72 applications for absent voters' ballots had been placed in the ballot box, but the envelopes with the statutory affidavits were not found therein. The envelopes had been placed in a drawer of the table or desk in the room where the ballots were being counted, and after the count had been completed the envelopes were left out of the ballot box and were later

found after the box had been sealed and were carried by the manager to the circuit clerk.

Chapter 237, Laws of 1950, provides the method of voting in a primary election by electors who are absent from the county on the day of the election or by electors who are unable to go to the polls by reason of sickness or physical incapacity. The Legislature, in enacting the absent voters' act, realized and understood that an absent voters' law was susceptible of widespread abuse, and might easily provide a method for the casting of illegal votes in the names of persons who, because of absence from the county or because of sickness or physical incapacity, were unable to appear at the polls and cast their ballots on election day in the usual manner. For that reason the Legislature prescribed in detail the procedure which must be followed by the voter in applying for and receiving an absent voter ballot, and in the marking of that ballot and in having the same duly authenticated by a notary public, and the procedure to be followed by election managers in receiving, counting and preserving the ballot after it has been delivered to the election managers on the day of the election. Without the envelope and the application it would be difficult, if not impossible, for the election managers, and the county executive committee to determine the validity of the absent voter ballot; and unless the envelope and application are preserved and retained, along with the absent voter ballot, the parties to an election contest would in many cases be unable to make proof of the validity or the invalidity of the votes cast under the absent voters' act.

We think that ██ ██ the requirement that the absent voter's envelope and the absent voter's application be preserved along with the ballot is mandatory, and not merely directory, and that the trial judge was not in error in holding that the failure of the election managers at the Goss precinct to preserve the applications and the affidavits of the absent voters destroyed the integrity of the ballots.

██ █ A somewhat different question is presented, however, in connection with the 75 absent voters' ballots which were cast at the Cedar Grove precinct. There 72 applications for absent voters' ballots had been placed in the ballot box, but the envelopes with the statutory affidavits were not found in the box. The envelopes had been placed in a drawer of the table or desk in the room where the ballots were being counted, and were later found after the box had been sealed and were carried by the manager to the circuit clerk. These envelopes, which contained the statutory affidavits, were therefore not lost or destroyed, but were available for examination by the County Executive Committee, when the committee canvassed the returns, and by the presiding judge and the election commissioners on the hearing before the special tribunal. We do not think that this irregularity in the handling of the absent voters' envelopes with the statutory affidavits was of such serious nature as to require the rejection of the ballots; and we think that the presiding judge erred in holding that these ballots had lost their integrity and could not be counted.

██ █ The appellee's main contention on this appeal, however, is that the court erred in holding that the initialing of the 240 ballots at the Cedar Grove box by H. O. Breland invalidated those ballots. The appellee's attorneys in their brief contend that this irregularity was not of such serious nature as to justify the rejection of the ballots.

Section 3159, Code of 1942, provides that: "The county executive committee shall designate a person whose duty it shall be to distribute all necessary ballots for use in a primary election, and shall designate one among the managers at each polling place to receive and receipt for the blank ballots to be used at that place. When the blank ballots are delivered to a local manager the distributor shall take from the local manager a receipt therefor signed in duplicate by both the distributor and the manager, one of which receipts the distributor shall

deliver to the circuit clerk and the other shall be retained by the local manager and which last mentioned duplicate receipt shall be inclosed in the ballot box with the voted ballots when the polls have been closed and the votes have been counted.''

Section 3164, Code of 1942, provides that: ''Upon the opening of the polls, and not before, the managers of the election shall designate one of their number, *other than the manager theretofore designated to receive the blank ballots,* who shall thereupon be known as the initialing manager. When any person entitled to vote shall appear to vote, he shall first sign his name in a receipt book or booklet provided for that purpose and to be used at that election only and which receipt book or booklet shall be used in lieu of the list of voters who have voted formerly made by the managers or clerks; whereupon and not before, the initialing manager shall indorse his initials on the back of an official blank ballot, prepared in accordance with law, and at such place on the back of the ballot that the initials may be seen after the ballot has been marked and folded, and when so indorsed he shall deliver it to the voter, which ballot the voter shall mark in the manner provided by law, which when done the voter shall deliver the same to the initialing manager in the presence of the others, and the manager shall see that the ballot so delivered bears on the back thereof the genuine initials of the initialing manager, and if so, *but not otherwise,* the ballot shall be put into the ballot box; and when so done one of the managers or a duly appointed clerk shall make the proper entry on the poll book.''

In the case of Hayes v. Abney, 186 Miss. 208, 188 So. 533, 536, the Court had under consideration the effect of the failure of the election officers to comply with the provisions of the above mentioned section requiring the voter to sign his name in a receipt book before the initialing manager was authorized to endorse his initials on the back of the ballot and deliver such ballot to the voter.

And the Court held in that case that the requirement that the voter should sign his name in a receipt book was mandatory, and that a complete departure from that provision of the statute rendered the election void. In that case, the Court said: ''We think this section was outstanding and mandatory for the prevention of fraud, and the preservation of the purity of the ballot box. When this section is followed, there can be no question as to who actually attended and voted in the particular election. With it ignored, the door is left wide open for frauds and the destruction of the will of those who actually qualified and voted in the election.''

In the case of Chinn v. Cousins, 201 Miss. 1, 27 So. (2d) 882, 883, the Court said: ''The voter must express his will through a legal ballot. A ballot not initialed by the manager may not be deposited in the box, for 'the manager shall see that the ballot so delivered bears on the back thereof the genuine initials of the initialing manager, and if so, but not otherwise, the ballot shall be put into the ballot box.' Obvious justification for such requirement need not be summoned to fortify the force of its plain language.''

There are obvious reasons why the legislature should have provided that the initialing manager shall be a person other than the manager designated to receive the blank ballots. The legislature was attempting to safeguard the integrity of the ballots and to prevent the fraudulent substitution of other ballots for the ballots marked by the voters. The initialing manager is required to place his initials on each ballot before it is deposited in the ballot box, thereby attesting the genuineness of the ballot. If the manager designated to receive the blank ballots were permitted to serve as initialing manager, he might easily substitute other ballots initialed by him for ballots marked by the voters.

In view of the plain provisions of the statute and the construction placed upon the statute by this Court in the cases cited above, the presiding judge was justified in

holding that H. O. Breland was disqualified to act as initialing manager and that his act in initialing the 240 ballots cast at the Cedar Grove precinct as stated above did not constitute sufficient compliance with the requirements of Section 3164, Code of 1942, and that the ballots thus initialed by him could not be counted.

The appellee's attorneys vigorously contend that the appellant should not be permitted to contest the election on any of the grounds assigned by him in his petition because of the fact that the appellant was guilty of actual fraud in procuring the casting of five illegal votes at the Cedar Grove box. The only reference made to the five illegal votes referred to in the findings of the special tribunal is contained in the following statement, which appears in the findings of the special tribunal: "It was admitted at the hearing that Nooks Sinclair procured exemption certificates for Helen Hall Loftin, Louis Hall, Glynn C. Hall, Mrs. Frank Deal and Stanley Watts, Jr., who were not legally entitled to the same, and that said five persons voted for contestant, and the five votes should be deducted from his total, which would reduce his majority from 24 to 19." There are no findings of fact by the special tribunal that the appellant, Nooks Sinclair, was guilty of actual fraud in procuring the exemption certificates for the above mentioned illegal voters, and we have not before us a transcript of the testimony of the witnesses. We must therefore hold that there is no merit in the contention thus made.

It is not necessary that we make other comment upon the large number of illegal votes cast at the Cedar Grove box. It is not shown to what extent the illegal votes cast affected the total number of votes received by each of the candidates. But in view of the other irregularities that occurred in the holding of the election it is clear that the will of the qualified electors cannot be ascertained from the findings of the special tribunal. We are of the opinion that the presiding judge was correct in holding that Fortenberry was not entitled

to be declared the nominee for the office of Supervisor for District No. 2. We are also of the opinion that Sinclair was not entitled to be declared the nominee on the face of the returns from the other three precincts. The special tribunal found that the failure of the managers of the election in the Cedar Grove precinct to comply with the requirements of the statute was not due to a deliberate design to bring about the election or defeat of a particular candidate by manipulating the election at the Cedar Grove box in such manner as to have the box thrown out. If the hearing of the contest by the special tribunal had been completed before the general election on November 6, 1951, this Court would have approved the action of the special tribunal in ordering a special primary election in the Cedar Grove precinct. But in view of the fact that the general election had been held when the special tribunal announced its decision on November 9, 1951, we think that the presiding judge erred in ordering a special primary election to be held in the Cedar Grove precinct on November 14, 1951.

 Since the general election had been held prior to a final decision in this case, it was too late to hold a special primary election limited to the Cedar Grove precinct. The election of Sheldon L. Fortenberry in the general election on November 6 should have been vacated and a special election should have been ordered to be held in the entire district in the manner provided in· Section 3187, Code of 1942.

The judgment of the special tribunal ordering that a new primary election be held in the Cedar Grove precinct, with Nooks Sinclair and Sheldon L. Fortenberry as the candidates for the office of Supervisor for District No. 2, will therefore be set aside, and a judgment will be entered here by this Court vacating the election of Sheldon L. Fortenberry as Supervisor for District No. 2 of Marion County for the term beginning on the first Monday of January 1952, and ordering a special election to be held

in the entire Supervisor's District No. 2 in the manner provided in said Section 3187, Code of 1942, to fill said office.

Reversed and judgment ordering special election.

**Hall** and **Roberds, JJ.,** took no part in the decision of this case; all other Judges concur.