443 So.2d 1191 (1983)
NOXUBEE COUNTY DEMOCRATIC EXECUTIVE COMMITTEE and Albert Walker
v.
Cecil RUSSELL.
No. 55136.
Supreme Court of Mississippi.
December 14, 1983.
*1192 Wilbur O. Colom, Colom, Mitchell & Colom, William L. Bambach, Columbus, for appellants.
W.H. Jolly, Jr., Threadgill, Smith, Sanders & Jolly, Columbus, Michael D. Ferris, Macon, Conrad Mord, Tylertown, for appellee.
En Banc.
ROBERTSON, Justice, for the court:

I.
This is an election contest. Cecil Russell and Albert Walker are contestants for the Democratic nomination for Sheriff of Noxubee County. The Noxubee County Democratic Executive Committee certified Walker as the party's nominee.
Russell sought judicial review. A special tribunal presided over by Chancellor George D. Warner, Jr., upheld Russell's appeal and declared him the party's nominee. Walker appeals from that decision. We affirm.

II.
On August 23, 1983, the Noxubee County Democratic Party held a second primary election to determine the party nominee for the office of Sheriff. The two contestants, Albert Walker and Cecil Russell, ran a close race. An initial count of the ballots showed that out of 5,629 votes cast, Russell *1193 won by a margin of 54 votes. A recount gave Russell 2,845 votes to Walker's 2,784, increasing Russell's winning margin to 61 votes. However, the Noxubee County Democratic Party Executive Committee refused to certify the returns and began investigating the ballots.
On August 31, 1983, Russell filed a request with Wallace Gray, Circuit Clerk of Noxubee County and custodian of the ballots, asking to examine the ballots. This request was denied because the Executive Committee was still conducting its own examination.
No official action was taken by the Committee until September 9, 1983. On that date, the Committee voted to throw out three ballot boxes because the receiving manager and the initialing manager were one and the same person for each box. The disqualified boxes and their count are as follows:

 CENTER POINT BOX
 Russell - 71 votes, 7 absentee
 Walker - 32 votes, 2 absentee
 Total - 103
 SHUQUALAK BOX NO. 3
 Russell - 133 votes, 7 absentee
 Walker - 108 votes, 9 absentee
 Total - 241
 SUMMERVILLE BOX
 Russell - 40 votes
 Walker - 13 votes
 Total - 53 (no absentees)

The absentee ballots were not disqualified.
Once these boxes had been thrown out, Walker appeared to be the winner. A motion was made that the Executive Committee examine the rest of the boxes to see if others suffered from the same defect. The motion was defeated by a 12 to 11 vote. On September 9, 1983, the returns from the Sheriff's election were finally certified and Walker was declared the Democratic nominee.
On September 12, 1983, Russell filed a petition to contest the certification action of the Executive Committee. On the same day Russell filed a second request with Gray, the Circuit Clerk, asking that he be allowed to examine the ballots on September 19. This time his request was granted. Russell's examination revealed that yet another box, Prairie Point No. 2, suffered from the same defect that had disqualified the first three boxes.
On September 20, 1983, after he had examined the ballots, Russell filed an amended petition to contest the election, alleging that the Prairie Point No. 2 box suffered from the same defect as had the other boxes. The Noxubee County Executive Committee, however, refused to alter its certification of Walker as the party's nominee for the office of Sheriff.
On October 7, 1983, Russell filed a petition for judicial review of the Committee's action in the Circuit Court of Noxubee County. After this petition had been filed, Chief Justice Patterson, acting pursuant to Miss. Code Ann. § 23-3-47 (1972), designated Chancellor George D. Warner, Jr., of the Twelfth Chancery District to hear this cause. Chancellor Warner immediately had notices of the contest sent to all of the parties. Summons and subpoenas were also issued.
The contest was heard on October 19, 1983, before a special tribunal composed of Chancellor Warner and three elections commissioners of Noxubee County. Before trial, the attorneys stipulated as to several matters, including the original number of votes received by each candidate. They also stipulated that the three boxes that had been thrown out initially were illegal and that the votes cast in those boxes ought not be counted. Both Walker and Russell agreed that those boxes should be thrown out.
The trial centered on Prairie Point No. 2 Box. The evidence established that Walker received 148 votes in that box, five of which were absentee votes while Russell received 52 votes in that box, two of which were absentee votes. The total count from that box was 200. Virgie J. Stewart testified that she was the receiving manager for that box; she picked up the box and the blank ballots from the circuit clerk's office *1194 and she returned it signing her name each time to the list as receiving managers. She also testified that she initialed all but one of the ballots on the back.
At the close of the trial, the chancellor disqualified the box and declared Russell the winner. He (and the complaint tribunal) based their decision on the case of Prescott v. Ellis, 269 So.2d 635 (Miss. 1972), which holds that the receiving manager and the initialing manager cannot be one and the same person. The chancellor made it clear that the reason he chose to throw the box out, as opposed to ordering a new election, was because the will of the voters would not be changed by so doing. One member of the complaint tribunal entered a partial dissent, feeling that a special election at the four boxes in question should be held.

III.
Of the issues presented for our review, only three require our consideration:
(1) Whether the court erred in failing to dismiss this contest because the supporting affidavits failed to state that the attorneys had made "independent" investigations of the allegations set forth in the plaintiff's complaint;
(2) Whether the court erred in failing to dismiss the case because the plaintiff failed to discover the irregularities within 12 days of the Committee's canvass and investigation of the ballots, even though the Committee did not certify either candidate at that time;
(3) Whether it was error for the court to throw out the Prairie Point No. 2 ballot box as opposed to ordering a special election.

A. The Attorneys' Affidavits

The manner in which primary elections may be contested is controlled by the Corrupt Practices Act, Miss. Code Ann. § 23-3-1 et seq. (1972). Section 23-3-45 dictates the procedures that are to be followed when an unsuccessful candidate wants to appeal the result of an election to a court. This section sets out the proper form that a petition for review should follow and, in relevant part, it provides:
But such petition for judicial review shall not be filed unless it bear the certificate of two practicing attorneys that they and each of them have fully made an independent investigation into the matters of fact and of law upon which the protest and petition are based and that after such investigation, they verily believe that the said protest and petition should be sustained and that the relief therein prayed should be granted. Miss. Code Ann. § 23-3-45 (1972).
In this case, the affidavits failed to state that the attorneys' investigations had been independent. The question then, is whether this defect is fatal to the contest.
Pittman v. Forbes, 186 Miss. 783, 191 So. 490 (1939) held that the reason the affidavits were required was to
"prevent persons declared party nominees from being harassed with trivial applications for judicial review thereof, and contemplates, as the word `independent' connotes, a certificate by lawyers who are without bias or prejudice". 186 Miss. at 789, 191 So. at 490.

In Harris v. Stewart, 187 Miss. 489, 193 So. 339 (1940), this Court reemphasized the limited purpose stated above, that the attorneys' affidavits are to serve. Harris held that the only valid reasons which might disqualify an attorney's affidavit were reasons that would disqualify a judge from hearing a case. It was said of the statute:
Every practicing attorney in the state was made a quasi-judicial officer to determine whether a proposed judicial hearing upon a primary election contest should be allowed and until the quoted statutory certificate is obtained from two of them, no such contest shall be instituted in the courts. And being quasi-judicial officers in respect to such an investigation, only that which would disqualify a judge would disqualify the certifying attorney and a collateral inquiry as to how he made his investigation or how fully he made it can no more be permitted *1195 than it could be questioned of a judge that he had failed to attend to the evidence and had not studied the law applicable to the case. 187 Miss. at 506, 193 So. at 343.
Walker argues that in light of Harris, if the statute were read so as not to require an allegation that the investigation were independent, it would render the provision meaningless, since one is not allowed to make substantive challenges to the independence of the examination or lack thereof. However, nothing in Harris or any other case prevents inquiry into the actual biases of an attorney such as would disqualify him under the Harris standard. For this reason, the chancellor was correct in refusing to dismiss the complaint on the ground that no allegations of bias or prejudice had been made. The challenge Walker makes against the two attorneys' affidavits is one going to the fullness of the investigation that had been conducted. This is the sort of inquiry proscribed by Harris.

B. The Twelve Day Rule

The final count of ballots by the Democratic Executive Committee was made on August 31, 1983. No certification of returns or nominees was made at that time. In fact, the Committee apparently retained the boxes, and examined them, which led to their meeting on September 9, 1983. On that date, the Committee disqualified three ballot boxes and certified Walker as the Democratic nominee.
On this appeal, Walker contends that because Russell failed to examine the ballots within 12 days of the final count, he should be barred from making objections based upon his examination. On the other hand, Russell contends that the time limit should start to run only when a candidate has been certified.
The statute at issue provides in relevant part:
When the returns for a box and the contents of the box ... have been canvassed and reviewed by the county executive committee, all the contents of the box ... shall be replaced therein by the executive committee and the box shall be forthwith resealed and delivered to the circuit clerk... . At any time after 12 days of the canvass and examination of the box and its contents by the executive committee, any candidate ... shall have the right of full examination of said box and its contents upon three days notice of his application therefor... . Miss. Code Ann. § 23-3-23 (1972). [Emphasis added].
The question presented by this case is how the words `canvass and examination' are to be construed. This statute contemplates a procedure whereby the Committee, after it has canvassed the returns, should return the ballots to the circuit clerk who keeps them so that the unsuccessful candidate can examine them as the statute provides. Presumably, the statute also contemplates that one candidate or the other should be certified as the winner immediately after the canvass and examination has been completed. If this were not the case, it would be impossible for an unsuccessful candidate to know whether he should examine the boxes because he would not know that he was unsuccessful.
The twelve day period contemplated by Section 23-3-23 does not begin to run until the Executive Committee has completed its canvass and examination of the returns. The Executive Committee has not completed its canvass and examination of the returns in a given race until it has certified the returns and declared an official winner. Under the facts of this case, the twelve day period began to run on September 9, 1983. Russell's contest on September 12 and request to examine the returns on September 19 were thus timely.
Here, we have a candidate, Cecil Russell, who, with good reason, believed that he won the race. The count and the recount indicated that this was so. Prior to September 9, 1983, he had no reason to believe that he had not won his party's nomination for the office of Sheriff. To construe the statute to require that the apparent winner, prior to certification of his opponent, *1196 should institute an examination of the returns would ascribe to the Legislature an absurd purpose, something we decline to do.

C. Walker's Sword: Herein of How Albert Walker Becomes Hoist Upon His Own Petard

The merits of the case turn on the four ballot boxes disqualified for violations of Miss. Code Ann. § 23-3-13 (1972), which provides that:
Upon the opening of the polls, and not before, the managers of the election shall designate one of their number, other than the manager theretofore designated to receive the blank ballots, who shall thereupon be known as the initialing manager... .
The purpose of this provision was set forth in Prescott v. Ellis, 269 So.2d 635 (Miss. 1972). Quoting Sinclair v. Fortenberry, 213 Miss. 219, 56 So.2d 697 (1951), we said:
There are obvious reasons why the legislature should have provided that the initialing manager shall be a person other than the manager designated to receive the blank ballots. The legislature was attempting to safeguard the integrity of the ballots and to prevent the fraudulent substitution of other ballots for the ballots marked by the voters. The initialing manager is required to place his initials on each ballot before it is deposited in the ballot box thereby attesting the genuineness of the ballot. If the manager designated to receive the blank ballots were permitted to serve as initialing manager, he might easily substitute other ballots initialed by him for ballots marked by the voters. 213 Miss. at 231, 56 So.2d at 701-02.
269 So.2d at 636.
In Prescott, the court held the above-quoted statutory provision mandatory.
In this connection, it is important to consider the stipulation agreed to by Walker and accepted by the trial court. We quote from the transcript of the proceedings below:
BY THE COURT:
As I understand it, both the Contestant and the Contestee each agree that the Center Point Box, the Shuqualak Box and the Summerville Box, due to irregularities, are improper votes  improper marking of the ballots. All three Boxes will be thrown out and not counted in the totals of the Democratic Primary with the exception of the absentee ballots.
BY MR. JOLLY: (attorney for Russell):
That's correct, Your Honor.
BY MR. BAMBACH: (attorney for Walker):
That's correct, Your Honor.
BY MR. JOLLY:
Your Honor, may I point out to you, just for the record, that is Shuqualak Box 3.
BY THE COURT:
Shuqualak Box 3. Thank you, sir. Now, I'd like to ask the Contestant and the Contestee. Mr. Walker, do you agree with this also, sir?
BY MR. WALKER:
I do.
BY THE COURT:
Mr. Russell, do you agree with this, sir?
BY MR. RUSSELL:
I do, Your Honor.
BY THE COURT:
Is there any objection from the members of the election commission and also members of this Tribunal?
BY THE ELECTION COMMISSION:
These three Boxes will be thrown out and not counted in the total votes in the Noxubee County election with the exception of nine absentee ballots at Center Point, seven for Russell and two for Walker; 16 absentee ballots at Shuqualak Box 3, seven for Russell and nine for Walker. The other totals will be subtracted at the appropriate time. I believe that's all you gentlemen were able to stipulate in the chambers; is that correct?
BY MR. JOLLY:
Yes, sir.
[Emphasis added].
*1197 Walker has unequivocally judicially agreed that the three boxes are disqualified and that no votes cast there may lawfully be counted. "Thrown out" are the words announced in the stipulation and agreed to by all.
The only deficiency in these three boxes is that in each case the receiving manager and initialing manager were one and the same person. This constitutes a violation of Section 23-3-13. These three boxes would have been disqualified under Prescott v. Ellis, 269 So.2d 635 (Miss. 1972) whether the parties agreed to it or not.
If all of this be so, it surely follows that each and every other box which may suffer the same or similar defects must likewise be "thrown out". Treating like cases alike is surely the most fundamental principle of justice as fairness.
Seen in this context, Prairie Point No. 2 box must be discarded. The uncontradicted facts are that Virgie J. Stewart served as the receiving manager and the initialing manager. This violation renders the votes cast there ineligible for counting. This is so because of the rule of Prescott v. Ellis, supra. This is so under elementary notions of justice.
Accordingly, after the disqualification of all votes in Center Point Box, Shuqualak Box No. 3, Summerville Box, and Prairie Point No. 2 Box, we hold that the final, official and lawful returns of the Second Primary Election for Democratic Party nomination for the office of Sheriff of Noxubee County held August 23, 1983, to have been:

 Cecil Russell 2565
 Albert Walker 2499

Cecil Russell is, therefore, the party's nominee.

IV.
We have considered whether a special election should be ordered. Indeed, Walker has urged, in the event we reject his appeal (as we have now done), that we order a new election rather than certify the returns with the Democratic voters of four precincts in effect disenfranchised.
When deciding whether a special election is warranted, we recognize competing interests which must be weighed and balanced. While the voters are not parties to this contest, their interests are paramount. Special elections are a great expense for the county and its taxpayers. Beyond that, the turnout for a special election is never as great as when there are a number of candidates on the slate. By contrast, we feel that the rights of the individual candidates cannot be allowed to overshadow the public good.
As far as the public good is concerned, the rights our law gives losing candidates to contest elections form a double edged sword. While they serve to prevent the fraudulent manipulation of the public will, they necessarily provide a way for the unsuccessful candidate to use innocent human errors to his own advantage, thereby winning a second chance.
When an election has been successfully contested, this Court has employed different tests over the years to aid its determination of what form of relief is in order.[1] By various routes, we have attempted to discern whether the entire election should be thrown out or only the tainted votes. We have employed a two pronged test which though it has been stated in different ways, essentially provides that special elections will be required only when (1) enough illegal votes were cast for the contestee to change the result of the election, or (2) so many votes are disqualified that the will of the voters is impossible to discern.[2]Walker v. Smith, 215 Miss. *1198 255, 56 So.2d 84, suggestion of error, 215 Miss. 263, 264, 57 So.2d 166, 167 (1952); Pyron v. Joiner, 381 So.2d 627 (Miss. 1980).
Here, as the disqualification of the illegal votes does not change the result of the election[3], we need only consider whether the irregularities were substantial enough to warrant a special election. In Walker, we clarified the manner in which we make this determination, finding that the question
depends upon the facts and circumstances in each particular case, including the nature of the procedural requirements violated, the scope of the violations, and the ratio of illegal votes to the total votes cast. 213 Miss. at 264, 57 So.2d 166.
As this rule has been applied in our case law, the nature of the procedural violation is important because if the irregularities are due to fraud or willful violations of the election procedure, this Court will not hesitate to order a new election, even though the percentage of illegal votes is small. See, e.g., Harris v. Stewart, 187 Miss. 489, 193 So. 339 (1940); Hayes v. Abney, 186 Miss. 208, 188 So. 533 (1939).
The scope of the violations and the ratio of illegal votes are significant, because even in the absence of fraud, the disenfranchisement of a significant number of voters will cast enough doubt on the results of an election to warrant voiding it. As a rule, if more than thirty percent of total votes have been disqualified, a special election will be required. See, e.g., Wallace v. Leggett, 248 Miss. 121, 158 So.2d 746 (1963); Ulmer v. Currie, 245 Miss. 285, 147 So.2d 286 (1962); Sinclair v. Fortenberry, 213 Miss. 219, 56 So.2d 697 (1952); May v. Layton, 213 Miss. 129, 55 So.2d 460 (1951).
On the other hand, when the percentage of illegal votes is smaller, even though the winning margin is less than the number of illegal votes, a special election may not be required. Pyron v. Joiner, 381 So.2d 627 (Miss. 1980) (disqualification of 3.9 percent of the votes did not warrant special election.) Walker v. Smith, 213 Miss. 255, 56 So.2d 84, suggestion of error 57 So.2d 166 (1952) (disqualification of six percent of the total vote did not warrant a special primary election.)
Applying the law to this case, we note first that no one has made any allegations of fraud. The parties agree that the errors in question were due to inadvertence and mistake. Second, although 565 votes have been disqualified, amounting to 10.04 percent of all votes cast in the race, with or without the illegal votes, Cecil Russell is the winner. While this ratio, under other circumstances, might be sufficient to require a new election, we note that here, the parties stipulated that the first three boxes should be "thrown out".
Essentially, Walker has agreed that the returns should be finalized even though three boxes be disqualified. From the beginning Walker has used Section 23-3-13 as his sword with which he has sought to wrest victory from Russell. Now a fourth box has been conclusively shown to have been just as deficient under Section 23-3-13 as Walker's original three. He who lives by the sword dies by the sword.
AFFIRMED.
*1199 PATTERSON, C.J., WALKER and BROOM, P.JJ., and ROY NOBLE LEE, BOWLING, HAWKINS and PRATHER, JJ., concur.
DAN M. LEE, J., not participating.
NOTES
[1] For a sampling, compare the rationales employed in Hayes v. Abney, 186 Miss. 208, 188 So. 533 (1939), Harris v. Stewart, 187 Miss. 489, 193 So. 339 (1940), Walker v. Smith, 213 Miss. 255, 56 So.2d 84 (1952), Berryhill v. Smith, 380 So.2d 1278 (Miss. 1980) and Pyron v. Joiner, 381 So.2d 627 (Miss. 1981).
[2] This rule was stated slightly differently in Trahan v. Simmons, 191 Miss. 353, 2 So.2d 575 (1941) which provided that a special election must be held when enough illegal votes were cast to change the result or leave it in doubt. It should be noted, however, that this statement of the rule does not mean that one only has to show that the number of illegal votes exceeded the winning margin, as language in O'Neal v. Simpson, 350 So.2d 998, 1012 (Miss. 1977) might imply. In both O'Neal and Clark v. Rankin County Democratic Executive Comm., 322 So.2d 753 (Miss. 1975) disqualification of the illegal votes caused a different result which, in and of itself would cast doubt upon the election. Moreover, in Pyron v. Joiner, 381 So.2d 627 (Miss. 1981), we held that a special election was not required even though the winning margin was only five votes and a total of 10,387 votes were disqualified.
[3] In view of the Committee's refusal to certify Russell and their subsequent refusal to examine other boxes to see if any suffered from the same defect as the first three, we think it would be inequitable to hold that the result of this election is changed in Russell's favor, when the count and recount of the ballot showed that he was the winner in the beginning. Cf. Walker v. Smith, supra, 213 Miss. at 262-63, 56 So.2d at 84.