# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2016-EC-00675-SCT

*TROY WESLEY*

*v.*

*WASHINGTON COUNTY DEMOCRATIC*
*EXECUTIVE COMMITTEE AND CARL McGEE*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/28/2016 |
| TRIAL JUDGE: | HON. L. BRELAND HILBURN |
| TRIAL COURT ATTORNEYS: | WILLIE GRIFFIN |
| | SANDRA JARIBU HILL |
| | JAMIE FERGUSON JACKS |
| | BENNIE LE NARD RICHARD |
| COURT FROM WHICH APPEALED: | WASHINGTON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | JAMIE FERGUSON JACKS |
| ATTORNEYS FOR APPELLEE: | SANDRA JARIBU HILL |
| | WILLIE GRIFFIN |
| NATURE OF THE CASE: | CIVIL - ELECTION CONTEST |
| DISPOSITION: | AFFIRMED -11/30/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, C.J., KITCHENS, P.J., AND BEAM, J.**

**BEAM, JUSTICE, FOR THE COURT:**

¶1. Appellant Troy Wesley lost the Democratic primary election for Washington County District 3 Supervisor on August 4, 2015. He subsequently petitioned the circuit court to request a new election, alleging that numerous irregularities had invalidated the former one. After a hearing on the matter, the Washington County Circuit Court granted summary judgment to defendants Carl McGee and the Washington County Democratic Executive Committee. Aggrieved, Wesley now appeals to this Court. In his appeal, Wesley cites no

discrepancy in the original vote totals and instead focuses his arguments on procedural problems, including an alleged lack of ballot-box security. While the failure to maintain ballot-box security is a serious issue worthy of reprimand, we find that Wesley's arguments are insufficient to raise a genuine issue of material fact and that summary judgment was properly entered in favor of the defendants.

**FACTS**

¶2. On August 4, 2015, the Democratic primary for Washington County District 3 Supervisor resulted in candidate Carl McGee receiving 448 votes and Troy Wesley receiving 378. The vote totals for the two candidates differed by 70 votes, but Wesley challenged the election—first by filing a petition with the Washington County Democratic Executive Committee (WCDEC), then by filing a complaint in Washington County Circuit Court against Carl McGee and the WCDEC. Before the trial court, Wesley alleged that numerous violations of election law had taken place and asked for a new election.

¶3. Prior to trial, both sides requested summary judgment. On October 21, 2015, McGee filed such a motion; then the WCDEC filed a motion for dismissal or, in the alternative, summary judgment. Wesley then filed for summary judgment and offered his own affidavit and various photos of ballot boxes in support of his allegations in the case. The trial court eventually held a hearing on February 23, 2016, and concluded that "[t]here has not been demonstrated to the Court that there [were] enough illegal votes cast . . . to change the result of the election." The court continued, explaining that "[i]t has not been established that so many votes are disqualified that the will of the voters is not established by this vote count."

Accordingly, the court issued an Order of Dismissal, in which it dismissed the case "with prejudice and all cost taxed to Plaintiff." Though noting that all of the parties admitted election irregularities had occurred, the court denied Wesley's motion for summary judgment and granted the motions of McGee and the WCDEC. Aggrieved, Wesley appealed to this Court.

¶4. In his appeal, Wesley continues to allege that numerous election irregularities occurred and that those irregularities require a new election for Washington County District 3 Supervisor. Narrowing his arguments to focus on ballot-box security, Wesley alleges the following:

1) The election result ballot boxes were not properly sealed as prescribed by law;

2) Election machine memory cards and results from machines were not in any closed box whatsoever, but in an open cardboard box in the circuit clerk's office;

3) The circuit clerk did not control and secure the ballot boxes as she was not in control of the boxes for weeks following the election;

4) Ballot boxes were left in the hallway of the courthouse, their tops open and at least one member[] of the WCDEC removed items from these boxes, all prior to Wesley's examination of the boxes;

5) Because of the WCDEC's failure to properly tally affidavit and absentee votes, the circuit clerk herself was forced to tally these votes;

6) Washington County Election Commission (William Gist) also handled and canvassed ballots for the WCDEC;

7) There is no agreement between the Washington County Election Commissioners and the WCDEC to assist in the canvass of ballots;

8)    There was no evidence in any of the election boxes that ballots were properly received and accounted for by the Receiving Managers at the polls – there were no receipts signed showing how many ballots were delivered (affidavit and curbside); and

9)    The results from the Lake Vista Lodge Machine #1 could not be found during Wesley's examination.[1]

Wesley argues that "the ballot box security issues alone are enough to warrant a new election."

¶5.    In response to Wesley's appeal, McGee asserts that Wesley failed "to provide concrete evidence to prove" that "alleged 'radical departures' changed the outcome of the election." Indeed, McGee claimed that, even if true, the irregularities noted by Wesley applied only to the 2.8% of the votes cast on paper, rather than electronic ballots. By themselves, the paper ballots were too few in number to change the election outcome. McGee admitted that

---

[1]Wesley fails to elaborate on the alleged issues regarding Lake Vista Lodge Machine #1 in his brief to this Court. Instead, he references a personal affidavit he filed at the trial level, in which he states that one of his representatives was unable to locate the memory card and results print-out from the machine in question. The affidavit presents various concerns with the lack of security and carelessness exhibited by the defendants in the execution of their responsibilities throughout the election. However, this personal affidavit–sworn out by the plaintiff, and including information received from third-party personnel—constitutes the only record evidence presented regarding Machine #1. Moreover, the affidavit itself is unclear as to whether the Lake Vista Lodge Machine #1 memory card was missing entirely or was merely in a different box than expected. Only in response to Defendants' motions and in an Itemization of Undisputed Facts did Wesley suggest that the circuit clerk had been "unable to locate the memory card" when Wesley examined the ballot boxes. He neither presented the clerk as a witness nor attempted to present evidence to corroborate this claim. Several months later, in the motions hearing before the trial court, Wesley's attorney merely emphasized that the results print-out from the machine was missing. Without more, Wesley's affidavit and his attorney's argument amount to nothing but unsupported claims. With no accompanying allegations of fraud or serious discrepancies in the vote count and no reason to doubt that the original election failed to express the will of the voters, we cannot find that the claims regarding Lake Vista Lodge Machine #1 create a genuine issue of material fact to reverse summary judgment against Wesley.

4

"various technical glitches" and "improper handling of paper ballots" had occurred, but he noted that Wesley "did not allege fraudulent or intentional illegal conduct on the part of election officials." According to McGee, allegations of fraud or intentional wrongdoing are necessary before a Mississippi court will overturn an election.

¶6.     Meanwhile, the WCDEC presents arguments similar to McGee's. It notes that only twenty-four ballots cast in the election were known to be paper ballots, but it concedes "that there were irregularities committed while the paper ballots were being counted." Still, the WCDEC emphasizes that voters cast 97.2% of the ballots in the election on electronic voting machines (EVMs) and that Wesley "offered no evidence that the integrity of the 802 votes cast by EVMs was destroyed or placed in doubt." Per the WCDEC, Wesley should have shown that an error in the EVM vote totals had occurred. Since he did not, too few disqualified votes existed to warrant a new election.

¶7.     In response to the arguments of McGee and the WCDEC, Wesley asserts that "the multiple ballot box security issues called *all of the votes* into question." He also remarks that "no one . . . can be certain how many paper ballots were cast in this election because the boxes were never properly secured." Thus, according to Wesley, the percentage of paper ballots versus electronic ballots was irrelevant, and the irregularities require a new election, whether or not they were fraudulent in nature.

## ANALYSIS

¶8.     Now, more than two years after voters first went to the polls in the Democratic primary for Washington County District 3 Supervisor, this Court must decide whether

5

summary judgment against Wesley was appropriate.

¶9.     In doing so, and in accord with longstanding practices, "[t]his Court applies a de novo standard of review to a circuit court's grant or denial of summary judgment." *Indemnity Ins. Co. of N. Am. v. Guidant Mut. Ins. Co.*, 99 So. 3d 142, 149 (Miss. 2012).   Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Miss. R. Civ. P. 56(c); *see also Indemnity Ins. Co. of N. Am.*, 99 So. 3d at 149.   In assessing summary judgment, "the evidence must be viewed in the light most favorable to the party against whom the motion has been made." *Kilhullen v. Kansas City S. Ry.*, 8 So. 3d 168, 174 (Miss. 2009) (citing *Daniels v. GNB, Inc.*, 629 So. 2d 595, 599 (Miss. 1993)).

¶10.     When a case involves an election, courts tread carefully, warranting new primary elections only under certain circumstances. "In a primary election contest, an election should be voided only if there has been such a departure from statutory compliance 'as to destroy the integrity of the election and make the will of the qualified electors impossible to ascertain.'" *Waters v. Gnemi*, 907 So. 2d 307, 315-16 (Miss. 2005) (quoting *Riley v. Clayton*, 441 So. 2d 1322, 1328 (Miss. 1983)).   The key to reviewing an election is to take the interests of the candidates into account while at the same time ultimately seeking to fulfill the will of the voters. *Noxubee Cty. Democratic Exec. Comm. v. Russell*, 443 So. 2d 1191, 1197 (Miss. 1983); *Rogers v. Holder*, 636 So. 2d 645, 651 (Miss. 1994); *see also Guice v. McGehee*, 124 So. 643, 647 (Miss. 1929) (noting "a general rule that election laws are

6

construed liberally in favor of the electors").

¶11.    Mississippi law sets detailed guidelines for local officials to follow when conducting an election, and those guidelines address the proper means for securing election materials both before and after voters have cast their ballots.  In the case before us, Mississippi Code Section 23-15-597 controls.  This section requires that, after a county primary election, a major political party's county executive committee is required to canvass the votes, unless it has an otherwise legal, written agreement with the circuit clerk or the county election commission permitting the circuit clerk or county election commission to help in the process.[2]  Miss. Code Ann. § 23-15-597 (Rev. 2015).  Once the canvassing process for a ballot box is complete, the law requires that

> [A]ll the contents of the box required to be placed and sealed in the ballot box by the managers shall be replaced therein by the election commission or executive committee, as the case may be, and the box shall be forthwith resealed and delivered to the circuit clerk, who shall safely keep and secure the same against any tampering therewith.

Miss. Code Ann. § 23-15-911(1) (Rev. 2015).[3]  Items that should have been sealed in the ballot box by that point include "all ballots voted, all spoiled ballots, . . . all unused ballots," a certificate declaring the voting results, and:

> [O]ne of the duplicate receipts given by the manager who received the blank ballots received for that box; and the total ballots voted, and the spoiled ballots and the unused ballots must correspond in total with the said duplicate receipt or else the failure thereof must be perfectly accounted for by a written statement, under oath of the managers, which statement must be inclosed in the

---

[2] "Canvass" here means "[t]o formally count ballots and report the returns." *Canvass*, Black's Law Dictionary (4th pocket ed. 2011).

[3] A 2017 amendment to this statute added the word "poll" in front of managers and removed the word "therewith."

7

ballot box. There shall be also inclosed in said box the tally list, the receipt booklet containing the signed names of the voters who voted; and the number of ballots voted must correspond with the number of names signed in said receipt booklet.

Miss. Code Ann. § 23-15-591 (Rev. 2015).[4] Circuit clerks even must follow specific procedures for sealing and resealing ballot boxes. Miss. Code Ann. § 23-15-595 (Rev. 2015). When irregularities occur regarding ballot-box materials, determining the "will of the voters" is a core consideration, and under certain circumstances, if the will of the voters is impossible to discern, "the entire box may be thrown out." Miss. Code Ann. § 23-15-593 (Rev. 2015). Therefore, the law unquestionably requires that local officials handle ballot-box materials with great care.

¶12. The need for care also extends to votes cast on electronic voting equipment. In 2015, after assessing election results, poll managers had to transport electronic voting materials to county or municipality tabulating centers. Miss. Code Ann. § 23-15-531.10 (Rev. 2015). Subsequently, the following procedure was to take place:

> Upon receipt of the sealed envelope or communication pack containing the zero tapes, results tapes and memory cards, the officials in charge of the election shall verify the signatures on the envelope or communication pack. Once verified, the officials in charge of the election shall break the seal of the envelope or communication pack and remove its contents. The officials in charge of the election shall then download the results stored on the memory card from each DRE unit into the election management system located at the central tabulation point of the county in order to obtain election results for certification.

---

[4] A 2017 amendment to this statute made minor revisions to the statute's wording.

8

Miss. Code Ann. § 23-15-531.10(7) (Rev. 2015).[5]

¶13.    This Court has addressed election challenges on numerous occasions.  *See, e.g.*,

***Rogers***, 636 So. 2d 645; ***Waters***, 907 So. 2d 307; ***Ruhl v. Walton***, 955 So. 2d 279 (Miss.

2007); ***Esco v. Blackmon***, 692 So. 2d 74 (Miss. 1997); ***Noxubee Cty.***, 443 So. 2d 1191.  In

such cases, several considerations have played roles in the Court's decisions.  In general, the

Court has sought to uphold the integrity of the election process and follow the wishes of the

voters.  ***Waters***, 907 So. 2d at 315-16.  More specifically, the Court also has looked to

determine whether a violated statute is mandatory or merely directory.  ***Rogers***, 636 So. 2d

at 647-48.  "If the violated statute is directory rather than mandatory and there is no

allegation or proof of fraud, the non-complying ballots are valid and properly counted," as

long as the integrity of the election is preserved.  *Id.* at 648.  On the other hand, "[v]otes not

in compliance with mandatory provisions of election statutes are illegal.  Votes illegally cast

are improperly counted." *Id.*  Thus, the nature of election statutes helps to determine which

votes count or not.

¶14.    Sometimes, though, election irregularities rise to a level warranting consideration of

a new election.  In such cases, this Court has implemented the following test:

> When an election has been successfully contested, this Court has employed
> different tests over the years to aid its determination of what form of relief is
> in order.  By various routes, we have attempted to discern whether the entire
> election should be thrown out or only the tainted votes.  We have employed a
> two pronged test which though it has been stated in different ways, essentially
> provides that special elections will be required only when (1) enough illegal
> votes were cast for the contestee to change the result of the election, or (2) so

---

[5] A 2017 amendment to this statute made minor revisions to the statute's wording and removed the reference to verifying signatures on the envelope or communication pack.

9

many votes are disqualified that the will of the voters is impossible to discern. *Noxubee Cty.*, 443 So. 2d at 1197. Sometimes the test shows that a new election is warranted. Sometimes it does not, even if a limited number of votes is discounted.

¶15. Either way, the factors we consider when evaluating elections sometimes combine to deem votes illegal or disqualified for reasons that, on their face, might seem minor. In *Noxubee County*, four voting boxes were worthy of disqualification because "the receiving manager and initialing manager were one and the same person." *Id.*; *see also Prescott v. Ellis*, 269 So. 2d 635, 636 (Miss. 1971). Even so, the disqualification affected too few votes to require a new election. *Noxubee Cty.*, 443 So. 2d at 1198.

¶16. In another case, this Court threw out three absentee ballots because the town clerk delivered them to her relatives improperly. *Lewis v. Griffith*, 664 So. 2d 177 (Miss. 1995). In still another case, a new Democratic primary election was permitted because, during and after the initial primary, neither the Democratic Party county executive committee nor the circuit clerk had maintained proper control of the election materials and because materials from several precincts ended up in two, unsecured cardboard boxes. *Waters*, 907 So. 2d at 332-35.

¶17. Importantly, a showing of fraud or similar activity is not required in order for a new election to be warranted. As noted in *Noxubee County*, demonstrating fraudulent electoral activity helps meet the threshold for calling voters back to the polls; though "the disenfranchisement of a significant number of voters will cast enough doubt on the results of an election to warrant voiding it." *Noxubee Cty.*, 443 So. 2d at 1198. As a result, evidence

10

of fraudulent activity is not required before calling a new election, even if the lack of such a requirement risks the possibility that losing candidates could try to benefit from "innocent human error." *Id.* at 1197. In *Waters*, this Court reaffirmed this standard, granting a new election and specifically stating that it was not accusing Holmes County election officials of "intended wrongdoing." *Waters*, 907 So. 2d at 336.

¶18.    Just as fraudulent activity in an election is not required in order for votes to be discounted, no hard and fast equation exists for determining when to reject the results of an election and hold a new one. Some cases suggest that when thirty percent of the votes are disqualified, courts should order a new election; yet those same cases leave the door open for new elections even when the percentage of discounted votes is smaller. *Noxubee Cty.*, 443 So. 2d at 1198; *Rizzo v. Bizzell*, 530 So. 2d 121, 128 (Miss. 1988). Ultimately then, one of the most important tests for assessing an election is the two-pronged test examining the numbers of illegal and disqualified votes. *Noxubee Cty.*, 443 So. 2d at 1197. The first prong of the test examines whether "enough illegal votes were cast for the contestee to change the result of the election," and the second prong examines whether "so many votes are disqualified that the will of the voters is impossible to discern." *Id.*

¶19.    We readily find that the first prong of the test is irrelevant to the facts of this case. On appeal, Wesley admits that he "may not have alleged fraud." With no allegations of illegal voting and no specific allegations of fraudulent election activity, we turn our analysis to the second prong of the *Noxubee County* test.

¶20.    Applying the second prong, we ask whether Wesley established a genuine issue of

material fact regarding the number of votes that should have been disqualified in the election. The cases cited above show that the disqualification of votes can occur even without fraudulent activity by election officials. Here, Wesley supported his position, making largely uncontradicted allegations of lapses in ballot-box security; though he failed to show that enough votes should be disqualified to give him another chance to win the election.

¶21.   Of Wesley's nine allegations on appeal, the fifth, sixth, and seventh addressed potentially improper activity by the circuit clerk and county election commissioners when processing election results.  Significantly though, Wesley made no specific claims indicating that the officials reached the wrong results.  Admittedly, the *Waters* case examined similar improper activity and granted a new election; but in that case, an almost complete breakdown of responsibility occurred among the Democratic county executive committee members, the election commissioners, and the circuit clerk.  *Waters*, 907 So. 2d at 331-33.  Almost no one fulfilled his or her proper election role, and though not determinative of the outcome of the case, officials had made severe mistakes in calculating the initial winner of the primary.  *Id.* at 310-12, 331-33.

¶22.   Wesley failed to allege such severe irregularities here.  He indicated that at least one commissioner participated in canvassing the vote when the WCDEC alone should have been involved.  He also argued that the circuit clerk tallied the absentee and affidavit ballots when the WCDEC should have done so instead.  Such activities, if true, certainly call into question the accuracy of WCDEC's efforts involved.  However, by themselves, the activities do not call into question the integrity of the entire election.

¶23.    Of more significance are Wesley's claims that election officials almost entirely neglected ballot-box security in the aftermath of the election.  Wesley alleged that the seals on boxes were inappropriate, that the circuit clerk failed to maintain control of the boxes, and that "there was no evidence in any of the boxes that ballots were properly received and accounted for by the Receiving Managers at the polls."  If true, the irregularities represent serious violations of election law.  In *Noxubee County* and *Waters*, this Court discounted votes for similar violations, and in *Waters*, a new election was warranted.  *Waters*, 907 So. 2d 307;  *Noxubee County*, 443 So. 2d 1191.  If paper ballots alone had been involved here, the circumstances almost certainly would demonstrate the need for voters to cast their votes again.  But paper ballots were not the only ballots in this election: the record indicates that only twenty-four paper ballots were successfully cast.  Wesley aptly claimed that, due to the election irregularities, no one can know how many paper ballots voters tried to cast.  On appeal, however, he points to no specific discrepancies in the paper-ballot vote count.  Even if this Court discounted all of the paper ballots tallied in the race, the election results would remain unchanged.

¶24.    Alternatively, the record demonstrates that electronic ballots represented the vast majority of votes cast during the election.  If Wesley successfully called into question their integrity, our decision today likely would be different.  But on appeal, Wesley's only specific references to the electronic ballots were that "the election machine memory cards and results from machines were not in any closed box whatsoever" and that "the results from the Lake Vista Lodge Machine #1 could not be found during Wesley's examination."  Notably, he did

not say whether he could determine if the electronic votes were properly downloaded after the election. *See* Miss. Code Ann. § 23-15-531.10(7) (Rev. 2015). He also did not suggest that the memory cards showed signs of tampering. Wesley may have alleged irregularities in the election process, but given the safeguards normally built into electronic voting machines, it is difficult to conclude that the irregularities either called into question the integrity of the election or blurred the will of the voters. Without more, Wesley has failed to establish a genuine issue of material fact that would suggest the need for a new election.

¶25. The Court recognizes and critically considers Wesley's allegations of violations of election procedure. Those allegations may have failed to refute the validity of the election, but if true, they represent serious violations of existing election law and a failure of election officials to fulfill their duties. This is especially true here, where both McGee and the WCDEC appeared to agree with Wesley that at least some irregularities occurred. While we recognize that no election is flawless, we encourage election officials in the county to adopt a stricter adherence to the State's election laws to prevent similar matters in the future.

## CONCLUSION

¶26. After applying the two-pronged test from *Noxubee County*, we affirm the trial-court judgment. *Noxubee Cty.*, 443 So. 2d at 1197. A key part of analyzing an election involves determining whether the will of the voters is clear. *See, e.g., Waters v. Gnemi*, 907 So. 2d at 315-16. Wesley's allegations suggest that serious violations of election law may have occurred during the 2015 Democratic primary for Washington County District 3 Supervisor, but Wesley failed to indicate that enough illegal votes were cast to warrant a new election.

14

He also failed to show that enough votes were disqualified to warrant a new election. Finding that Wesley failed to meet the requirements under the *Noxubee County* test, we affirm the circuit court's decision to dismiss the case on defendant's summary judgment motion.

¶27. **AFFIRMED.**

**WALLER, C.J., RANDOLPH AND KITCHENS, P.JJ., COLEMAN, MAXWELL, CHAMBERLIN AND ISHEE, JJ., CONCUR. KING, J., NOT PARTICIPATING.**