# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2004-EC-00007-SCT

*DEBRA WATERS*

*v.*

*JAMES "DANNY" GNEMI*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/13/2003 |
| TRIAL JUDGE: | HON. ALBERT B. SMITH, III |
| COURT FROM WHICH APPEALED: | HOLMES COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | MARVIN E. WIGGINS, JR. |
| ATTORNEYS FOR APPELLEE: | LESLIE SCOTT |
| | TOMMIE SULLIVAN CARDIN |
| NATURE OF THE CASE: | CIVIL - ELECTION CONTEST |
| DISPOSITION: | AFFIRMED - 06/02/2005 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1.     Because of the Special Tribunal's order calling for a new election, thus nullifying her apparent victory in the first Democratic primary election for the office of District Three Supervisor in Holmes County, Debra Waters appeals to us seeking relief.   Finding that the Special Tribunal appropriately set aside the results of the first primary election and ordered a special second primary between Debra Waters and James "Danny" Gnemi, we affirm.

**FACTS AND PROCEEDINGS BEFORE THE HOLMES COUNTY DEMOCRATIC EXECUTIVE COMMITTEE AND THE SPECIAL TRIBUNAL**

¶2.     The relevant facts concerning the 2003 Democratic primary election for the office of District Three Supervisor in Holmes County are for the most part undisputed.  Roy Anderson, James "Danny" Gnemi and Debra Waters qualified to run for the office of District 3 Supervisor.   Gnemi was the incumbent, having served as District 3 Supervisor for almost sixteen years at the time of the first primary election on August 5, 2003.   Around 4:00 a.m., on August 6, 2003, the Holmes County Democratic Executive Committee (HCDEC) announced that in the District 3 Democratic primary election, Waters had received 576 votes, Gnemi had received 496 votes, and Anderson had received 72 votes.   There were two write-in votes and forty residual votes.[1]  Additionally, this announcement was made prior to the counting of the affidavit ballots.[2]   Holmes County uses the Optical Mark Reading Equipment Voting System (OMR) to scan and count its ballots.[3] The OMR is programmed to "kick-out" ballots

---

[1] These residual votes consisted of overvotes and undervotes.  An overvote occurs when a citizen votes for more than one candidate in a particular election on the ballot, and an undervote occurs when a citizen fails to vote in a particular election on the ballot.  Obviously, unless expressly noted on the ballot and otherwise permitted by law, a voter cannot legally vote for more than one candidate in the same election, and thus, in the case of an overvote, that ballot, while not totally void as to other elections appearing on the ballot, is not counted for that particular election.

[2] An affidavit ballot is utilized when the qualification of a citizen to vote in a particular election or precinct is challenged at the polls.  In order to preserve that citizen's vote, the citizen casts an affidavit ballot at the precinct, and at the time of the subsequent certification process, the county party executive committee or the county election commission, as the case may be, will determine whether the affidavit ballot can be counted.

[3] Certainly, with the OMR, it ordinarily would not have taken as long as it did to count the ballots and tally the results, but on that evening, there were persistent problems with the OMR stopping during the scanning process.

containing overvotes and undervotes for visual examination by the appropriate election officials. After the HCDEC convened for the final certification process, it was determined that Waters had received 579 votes, Gnemi had received 503 votes, and Anderson had received 72 votes. In order to arrive at the denominator to calculate the percentage of votes received by each candidate in this supervisor's election, the HCDEC added the total votes of the three candidates (579 + 503 + 72) as well as the write-in (2) and residual (40) votes. This simple math resulted in a total number of 1,196. Using the number 1,196 as the denominator, the HCDEC calculated that Waters had received 48.41% of the vote (579 divided by 1,196), Gnemi had received 42.05% of the vote (503 divided by 1,196), and Anderson had received 6.02% of the vote (72 divided by 1,196). Based on these percentages, it was obvious that there would be a second primary election on August 26, 2003, between Waters and Gnemi, since no candidate received a majority vote.

¶3. Keeping in mind that the August, 2003 primaries in Mississippi involved elections for both state-wide and local offices, immediately after the first primary certification, each of the 82 circuit clerks had to commence preparation in that clerk's respective county for the second primary elections three weeks later. This preparation most importantly included the act of having the ballots printed. This process was commenced in Holmes County, and the second primary ballot included the Waters/Gnemi election. However, during this time-frame, Waters telephoned both the Secretary of State's office and the Mississippi Democratic Party office and talked with unidentified individuals in those respective offices. According to Waters, she was informed in these phone conversations that the residual votes and the write-in votes should

3

not have been included in the vote total to calculate the percentages, and that a recalculation without these 42 votes revealed that Waters was the outright winner of the first Democratic primary, and thus, the Democratic nominee for the office of District Three Supervisor in Holmes County.[4]

¶4.     On August 21, 2003, the Holmes County Circuit Clerk's office received a fax transmission from the Secretary of State's office addressed to the HCDEC.  This fax included a 1991 Attorney General's opinion  stating that "residual and other invalid votes" should not be included in calculating the percentages of votes received by any particular candidate. Around 9:30 a.m. on August 21, 2003, Gnemi (who had been campaigning since August 6[h] for a second primary) received a telephone call from a supporter inquiring "what's going on at the courthouse?"  Upon placing a phone call to Earline Wright-Hart, the Holmes County Circuit Clerk, Gnemi learned that he would "probably be getting a call." Around noon, Gnemi in fact received a phone call from a member of the HCDEC informing Gnemi to be at the courthouse at 1:30 p.m. that day.  Upon arrival at the courthouse, Gnemi was informed by Elma Maxine Smith, the HCDEC chair, that there would not be a second primary in the District 3 Supervisor's election because it had been determined that Waters had won the first primary

---

[4]By reducing the original denominator of 1,196 by the number of residual and write-in votes, the new denominator is 1,154.  Accordingly, the re-calculated percentages are Waters – 50.17% of the vote (579 divided by 1,154); Gnemi – 43.59% of the vote (503 divided by 1,154); and, Anderson – 6.24% of the vote (72 divided by 1,154).  Thus, after the re-calculation without the residual and write-in votes included in the count, Waters received one vote more than necessary to achieve a majority vote.

4

election.[5]    Smith showed Gnemi the fax from the Secretary of State's office addressed to "Mrs. Maxine Smith, as requested." This fax transmission consisted of the 1991 Attorney General's opinion concerning a school bond issue, with discussion as to how to calculate percentages in elections involving residual and write-in votes.    Smith then handed Gnemi a typed document which stated:

> A question was raised regarding the election results of the District 3 Supervisors (sic) race.[6]
>
> The Holmes County Democratic Executive Committee contacted the Secretary of State Office (sic) to receive information and a recommended ruling on the question raised.
>
> The Holmes County Executive Committee also solicited information from the Attorney General's Office as well as the State Democratic Executive Committee.
>
> Based upon the information received from the above stated agencies, the Holmes County Executive Committee has ruled that Ms. Debra Waters is the declared winner in the District 3 Supervisors (sic) race on August 5, 2003.

¶5.    Knowing that the second primary had already been set, and that absentee votes were already being cast by the voters in the Waters/Gnemi run-off, Gnemi, after being blind-sided

---

[5]It must be kept in mind that the HCDEC's decision to declare Waters the Democratic nominee, thus nullifying a second, was made sua sponte without a candidate filing a written petition or protest with the HCDEC, and after the HCDEC had certified the first primary election results to the Secretary of State, which certification revealed that a second primary election had been declared between Waters and Gnemi for District 3 Supervisor.

[6]We now know that this "question" was surreptitiously raised by Waters by telephoning the offices of the Secretary of State and the Mississippi Democratic Party.  This action was taken in lieu of attempting to avail herself of the statutory remedies to address election grievances so that all affected candidates would have had fair notice as to her intentions.

5

with this revelation,[7] not surprisingly wanted to pursue the issue and thus inquired of Smith and the HCDEC members as to what rights he had and whether he could have a "recount."[8] After this conversation, Gnemi went to the Circuit Clerk's office and prepared a handwritten note which stated, "I wish to have a recount in Dist. 3 election. Only 2 votes difference for a runoff." Gnemi signed and dated this note and then Hart stamped the note as filed on August 21, 2003. Gnemi then went back upstairs in the courthouse where the HCDEC was meeting and in due course, Hart returned and informed the HCDEC that Gnemi had requested a "recount."

¶6. The next day, Gnemi and Waters were present, and Hart presented them with a document which Gnemi and Waters both signed as "agreed to form." The document was dated August 22, 2003, and contained language confirming that Waters, on August 21, 2003, had been declared by the HCDEC to be the winner of the first primary election, that Gnemi had requested an examination of the ballot boxes the previous day, that Waters waived the statutory three-day notice,[9] and that the examination commenced at 10:45 a.m. and ended at 4:36 p.m. the same day. Since there are six precincts in District 3, Gnemi, during the examination process that day, expected to be presented with six metal precinct ballot boxes which had been sealed since

---

[7]At a later hearing before the Special Tribunal, Gnemi testified he was "floored" when he learned that, after campaigning for 15 days since the first primary, and with knowledge that absentee ballots were already being cast in the District 3 Supervisor's election, the second primary in the Waters/Gnemi election had been abruptly canceled by unilateral action of the HCDEC.

[8]As will be discussed in due course, there is no such statutory creature as a "recount" in our election laws.

[9]*See* Miss. Code Ann. § 23-15-911 (Rev. 2001).

the August 5th primary. However, instead, he was presented with two cardboard boxes containing commingled ballots and other election materials from the six metal precinct ballot boxes.[10] When Gnemi inquired as to why these election materials were not still sealed in the metal ballot boxes, Hart stated that the election materials from the first primary election had to be emptied into the two cardboard boxes so that the metal ballot boxes could be re-used for the upcoming second primary. Hart likewise disclosed two documents signed by Wilbur B. Redmond, the Holmes County District Three Election Commissioner. These documents revealed that Redmond certified that the two cardboard boxes contained the election materials from the August 5th Democratic primary for District 3, and that Redmond had removed these materials from the precinct ballot boxes on August 19, 2003, in preparation for the second primary.[11] Despite his concern about the method of preservation of the election materials, Gnemi examined the contents of the two cardboard boxes. Hart was able to identify the election materials by precinct, and as Gnemi concluded his examination of the election materials from a particular precinct, Hart placed these materials, not in one of the two cardboard boxes, but instead in the appropriate metal precinct box, which was then double-sealed.

¶7. After the examination of the election contents, and upon reflection, Gnemi filed an unsworn handwritten protest with the HCDEC at 10:30 a.m., August 25, 2003, the day before

---

[10]The condition of these cardboard boxes will be discussed later in the opinion.

[11]The involvement of Redmond and other Holmes County Election Commissioners in this Democratic primary election will be discussed in more detail later in this opinion.

7

the second primary. Some of the complaints contained in Gnemi's petition were (1) that after declaring a second primary in the District 3 Supervisor's election, the HCDEC abruptly canceled the second primary, (2) that at the time of the cancellation of the second primary just 4 days prior to the scheduled date,[12] ballots for the Gnemi/Waters election had been printed and absentee voting was already occurring, (3) that Gnemi was not notified of the HCDEC's action until the afternoon of August 21, 2003, after he had been campaigning for the second primary election since August 6, 2003, and (4) that at the time of the examination of the election materials, it was obvious that these materials had been stored in unsecured cardboard boxes. No action was taken by the HCDEC on Gnemi's petition prior to the August 26th second primary, and no official notice had been given to the voting public regarding the HCDEC's decision to cancel the second primary election in the District 3 Supervisor's race. The computer printout from the second primary election revealed that Gnemi received 397 votes (52.16% of the vote) and that Waters received 306 votes (40.21% of the vote). However, the HCDEC refused to certify these election returns based on its prior action in canceling the second primary and declaring Waters to be the Democratic nominee to face general election opposition for the office of District 3 Supervisor.

¶8.     On or about August 29, 2003, Gnemi received from the HCDEC a letter dated August 28, 2003, informing him that his petition was denied and advising him of his right to appeal the HCDEC's findings. On September 23, 2003, Gnemi, with counsel, filed his sworn petition for

---

[12]The record reveals that the HCDEC actually canceled the second primary for District 3 Supervisor on August 21, 2003, which was five (not four) days prior to the second primary, which was held on August 26, 2003.

judicial review in the Circuit Court of Holmes County. Upon being notified, the Chief Justice of this Court, pursuant to statute, promptly entered an order appointing Hon. Albert B. Smith, III, a circuit judge from the Eleventh Circuit Court District, to preside over all proceedings in this election contest. Judge Smith promptly performed his statutory responsibilities and established an expedited discovery schedule, but due to existing scheduling conflicts of some of the attorneys, a hearing could not be held until October 27, 2003.

¶9. Thus, on October 27, 2003, Judge Smith called this case up for a hearing at the Holmes County Courthouse in Lexington.[13] Gnemi and Waters were present and represented by counsel. Judge Smith received sworn testimony from five witnesses who were called in Gnemi's case-in-chief, and sworn testimony from four witnesses who were called in Waters's case-in-chief. The parties exercised their right of cross-examination of the witnesses and Judge Smith admitted 14 exhibits into evidence. Judge Smith also allowed opening statements at the commencement of the hearing and closing arguments at the conclusion of the presentation of the evidence.

¶10. At the conclusion of the hearing, Judge Smith rendered a bench opinion in open court which was later memorialized via a final order dated November 13, 2003, and subsequently entered on November 17, 2003. We briefly quote from Judge Smith's very detailed order:

> [T]hat there was a violation of Miss. Code Ann. § 23-15-911 due to the ballots cast for the office of Supervisor, Beat 3, Holmes County, Mississippi, being

---

[13]It is clear from the record that, notwithstanding the provisions of Miss. Code Ann.§ 23-15-931 (Rev. 2001), Judge Smith did not convene a special tribunal with the five county election commissioners to hear this primary election contest. While the record is silent as to the reasons for Judge Smith's failure to convene the special tribunal, the impracticality of such action in this case will soon become readily apparent.

removed from the ballot boxes used in the primary election and being placed in cardboard boxes prior to the expiration of the requisite time period set forth in Miss. Code Ann. § 23-15-911.

[T]hat the violation of Miss. Code Ann. § 23-15-911 is a total departure from the mandatory provisions of the statute, preventing Plaintiff James "Danny" Gnemi from being able to file any type of valid protest and therefore resulting in Mr. Gnemi losing his right to have a recount.

¶11. Having made these findings, Judge Smith, via the same order, directed, inter alia, that (1) the November 4, 2003, Holmes County general election for District 3 Supervisor be postponed; (2) a special primary runoff election between Waters and Gnemi be held on December 16, 2003; and, (3) a special general election for District 3 Supervisor be held on January 6, 2004, between the emerging Democratic nominee and the Independent candidates who had qualified prior to the expiration of the qualifying deadline. In the same order, Judge Smith quite appropriately issued directions to the election officials concerning preparation for these elections, and Judge Smith likewise quite appropriately declared that since the qualifying deadline had long since passed, it would not be reopened to allow additional candidates to run in these special elections.

¶12. In due course Waters, timely appealed to us seeking relief from the circuit judge's order.

**DISCUSSION**

¶13. We recite here basically verbatim the five issues which Waters requests that we consider: (1) The special tribunal was without jurisdiction to consider the petition for judicial review filed by James Gnemi, who failed to comply with the requisites mandated by statute;

10

(2) The special tribunal committed error by granting relief under the petition for judicial review on the grounds of an asserted violation of Miss. Code Ann. § 23-15-911 (1972), as amended; (3) The special tribunal committed error by granting relief under the petition for judicial review on the grounds of an asserted denial of Gnemi's "right to a recount;" (4) The special tribunal committed error by granting relief under the petition for judicial review since the decision was not supported by the findings cited in the order of the special tribunal; and, (5) The special tribunal committed error in subjecting the innocent voters of District Three of Holmes County to the costs of the technical violation of an election procedure by the election officials, without any finding of fraud or of an attempt to manipulate the outcome of the election in favor of, or against, one candidate over another.

¶14. Before commencing a thorough discussion of the issues, we feel compelled to make at least a few observations. When this Court judicially enacted the Mississippi Rules of Civil Procedure effective on and after January 1, 1982, it was made abundantly clear that there were certain civil actions which quite appropriately should continue to be governed by statute. Miss. R. Civ. P. 81(a)(4) expressly states that proceedings pertaining to election contests would continue to be governed by statutory procedures with the rules of civil procedure having limited applicability. Our cases are legion where we have relied heavily on legislatively enacted election laws to determine the appropriate outcome in election contests which were appealed to us. Today's case is no exception, and in fact we recently again emphasized the role of our statutes which appropriately guide both our courts and the election officials who shoulder the responsibility of assuring fairness in the election process throughout our State.

11

In ***Barbour v. Gunn***, 890 So.2d 843, 847 (Miss. 2004), we addressed one of the purposes of

Miss. Code Ann. § 23-15-927 (Rev. 2001), which provides for the filing of a petition for

judicial review in circuit court:

> The statute was crafted in that fashion to preserve the voices of the voters of
> Mississippi.  If the trial court could not hear such a complaint, a contested
> primary might very well drag on past the general election, thereby
> disenfranchising the members of a political party.  This is not permissible.  The
> right to vote is an important badge of citizenship that should be treasured by all
> citizens, and Mississippi courts must safeguard it accordingly.  The trial court
> acted in accordance with the will of the Legislature and in the best interests of
> the citizens of Mississippi by taking jurisdiction of the election contest.

***Id.*** at 847.

¶15.    Another point should be made abundantly clear.  The statutes which govern primary

election contests and the statutes which govern general election contests are altogether

different creatures.  A person wishing to contest a party primary election must file a petition

for judicial review in circuit court, at which time, upon notice by the circuit clerk, the Chief

Justice of the Supreme Court will appoint a circuit judge or chancellor from a district not

embraced by the county in which the election irregularities allegedly occurred, and the duly

appointed judge will proceed to hear the election contest as the presiding judge of a special

tribunal, composed of the judge and the five county election commissioners.  Miss. Code Ann.

§§ 23-15-927, -929, -931 (Rev. 2001).  In a primary election contest, an election should be

voided only if there has been such a departure from statutory compliance "as to destroy the

integrity of the election and make the will of the qualified electors impossible to ascertain."

***Riley v. Clayton***, 441 So.2d 1322, 1328 (Miss. 1983)(citing ***Ulmer v. Currie***, 245 Miss. 285,

12

147 So.2d 286 (1962); *Sinclair v. Fortenberry*, 213 Miss. 219, 56 So.2d 697 (1952);

*Gregory v. Sanders*, 195 Miss. 508, 15 So.2d 432 (1943)).  This Court has stated:

> We have employed a two pronged test which though it has been stated in different ways, essentially provides that special elections will be required only when (1) enough illegal votes were cast for the contestee to change the result of the election, or (2) so many votes are disqualified that the will of the voters is impossible to discern.[] *Walker v. Smith*, 215 Miss. 255, 56 So.2d 84, suggestion of error, 215 Miss. 263, 264, 57 So.2d 166, 167 (1952); *Pyron v. Joiner*, 381 So.2d 627 (Miss. 1980).

*Noxubee County Democratic Exec. Comm. v. Russell*, 443 So.2d 1191, 1197-98 (Miss.

1983).   On the other hand, a person wishing to contest a general election must file a petition

in circuit court, and the case is ultimately tried before a duly impaneled jury which by a verdict

"shall find the person having the greatest number of legal votes at the election."  Miss. Code

Ann. § 3-15-951 (Rev. 2001).[14]   Obviously, in today's case, we are confronted with a primary

election contest as opposed to a general election contest.

¶16.   Finally, we note that election contests (both primary and general) are by their very

nature required to be put on a "fast-track" by both election officials and the courts.  While we

all want to assure fairness and discern the will of the voters, we must move promptly so as to

not disrupt the election process.   Candidates and their families, friends and supporters have

worked too hard.   But admittedly, this whole process is really not about the candidates, but

---

[14]Unlike a primary election contest, where the statute requires that the Chief Justice appoint a circuit judge or a chancellor "of a district other than that which embraces the county or any of the counties, involved in the contest or complaint," in a general election contest, the circuit judge in the district where the election contest is filed may preside over the trial, although sua sponte recusals are not uncommon in general election contests.

13

instead it is about preserving the integrity of the election process and assuring that the voices of innocent voters are heard. To this end, we have stated:

> When deciding whether a special election is warranted, we recognize competing interests which must be weighed and balanced. While the voters are not parties to this contest, their interests are paramount. Special elections are a great expense for the county and its taxpayers. Beyond that, the turnout for a special election is never as great as when there are a number of candidates on the slate. By contrast, we feel that the rights of the individual candidates cannot be allowed to overshadow the public good.
>
> As far as the public good is concerned, the rights our law gives to losing candidates to contest elections form a double edged sword. While they serve to prevent the fraudulent manipulation of the public will, they necessarily provide a way for the unsuccessful candidate to use innocent human errors to his own advantage, thereby winning a second chance.

*Hatcher v. Fleeman*, 617 So.2d 634, 640-41 (Miss. 1993) (quoting from *Noxubee County*, 443 So.2d at 1197).

¶17. With this backdrop, we now address the issues in today's case, and in so doing, we restate and reorder for clarity the issues as presented to us by Debra Waters.

## I. WHETHER THE SPECIAL TRIBUNAL HAD JURISDICTION TO CONSIDER GNEMI'S PETITION FOR JUDICIAL REVIEW.

¶18. Waters argues that the special tribunal which convened to review this election contest lacked subject matter jurisdiction due to Gnemi's failure to meet jurisdictional prerequisites enumerated in our election statutes. Specifically, Waters alleges five separate procedural deficiencies. Waters alleges that Gnemi's petition filed with the HCDEC was unsworn; that Gnemi's petition for judicial review with attached documentation was not properly verified; that Gnemi failed to meet the express statutory requirement of obtaining proper certification

14

from two practicing attorneys; that Gnemi did not properly submit the required cost bond, which must be posted in the amount of $300, and which must also be accompanied by two or more sufficient sureties conditioned to pay court costs in the event the contestant/petitioner does not prevail; and, that Gnemi's pleadings were insufficient to maintain an action with the special tribunal.

## A. Was Gnemi's petition filed with the HCDEC properly sworn?

¶19. Waters alleges that Gnemi failed to file a sworn petition when contesting the primary election before the HCDEC. Waters is correct. However, Gnemi was not required to file a sworn petition with the HCDEC. Miss. Code Ann. § 23-15-921 (Rev. 2001) sets out the procedure to be followed when filing a protest with a county party executive committee. That statute states in pertinent part:

> [A] person desiring to contest the election of another person returned as the nominee of the party to any county or county district office, or as the nominee of a legislative district composed of one (1) county or less, may, within twenty (20) days after the primary election, file a petition with the secretary, or any member of the county executive committee in the county in which the election was held, setting forth the grounds upon which the primary election is contested.

This statute does not state or imply a requirement that the written petition filed with the county executive committee must be sworn. Waters goes further and alleges that the applicable statute governing the filing of a circuit court petition for judicial review requires that not only must the petition for judicial review be sworn, but there must also be attached to this petition a sworn copy of the petition filed with the county executive committee. Waters is correct; however, she misinterprets the meaning of the phrase "sworn copy of the petition." The

15

applicable statute governing the filing of a petition for judicial review is Miss. Code Ann. § 23-15-927, which states in pertinent part:

> [T]he contestant shall have the right forthwith to file in the circuit court of the county wherein the irregularities are charged to have occurred.......a sworn copy of his said protest or complaint, together with a sworn petition, setting forth with particularity wherein the executive committee has wrongfully failed to act or to fully and promptly investigate or has wrongfully denied the relief prayed by said contest, with a prayer for a judicial review thereof.

This statute specifically governs the circuit court action after a contestant has received no relief from the county executive committee. More than a procedural technicality, the requirement that the circuit court petition for judicial review be sworn insures a subsequent reviewing special tribunal that the matter before it is meritorious and reviewable, having been formerly and properly ruled upon by the county party executive committee.

¶20.    In *Miller v. Oktibbeha County Democratic Executive Committee*, 377 So.2d 917 (Miss. 1979), we examined the sworn contest requirement at issue in this case. In citing our earlier decisions in *Robinson v. Briscoe*, 326 So.2d 796 (Miss. 1976); and, *Darnell v. Myres*, 202 Miss. 767, 32 So.2d 684 (1948), we affirmed the special tribunal's dismissal of a primary election contest petition and stated that "[t]he contest must be sworn as originally filed with the Executive Committee, the purpose of the statute being to guard against frivolous interruptions of the orderly progression of the primary election process." *Miller,* 377 So.2d at 918. We further stated in *Miller* that the contestant's failure to have the contest "sworn as originally filed with the Executive Committee" was a jurisdictional defect.

16

¶21.    We can understand Waters's reliance on *Miller*, *Robinson*, and *Darnell*.  Unfortunately, this Court, in *Miller*, relied on *Robinson*, which had misinterpreted *Darnell*.

In a three-paragraph opinion, this Court, in *Robinson*, affirmed the circuit court's dismissal of an election contest due to the contestant's alleged failure to comply with the statute concerning the protest or complaint which is filed with the county party executive committee.

Our opinion in *Robinson* states in pertinent part:

> This is an appeal from the Circuit Court of Marshall County which sustained a plea in bar of the appellee, Wayne Briscoe, and dismissed the case against him. The court found the appellant, Sam T. Robinson, had not complied with the requirements of Mississippi Code Annotated section 23-3-45 (1972)[15] wherein 'the contestant shall have the right forthwith to file with the circuit court .... a sworn copy of his said protest or complaint, together with a sworn petition.....'
>
> The issue before the Court is whether the contestant in an election contest complies with the statute when he files a petition for judicial review and attaches to it an unsworn copy of the protest or complaint filed with the party executive committee.  It is the opinion of the Court that all issues presented are controlled by *Darnell v. Myres*, 202 Miss. 767, 32 So.2d 684 (1947).  The statute requires the protest or complaint to be sworn to.

326 So.2d at 796-97.

¶22.    In *Darnell*, the winner of the primary election subsequently lost an election contest before the county party executive committee and sought judicial review.  Upon commencing an action for judicial review by a special tribunal, the primary election winner failed to attach as an exhibit to his petition a copy of the answer which he had filed as the contestee before the party executive committee; therefore, the petition for judicial review was dismissed by the

---

[15]This statute is now Miss. Code Ann. § 23-15-927 (Rev. 2001).

special tribunal.    In  upholding  the  dismissal,  we  discussed  the  procedural  prerequisite

concerning the filing of pleadings with the county executive committee:

> [W]hen  the  contestee  [the  original  winner]  would  complain  to  the  special
> judicial tribunal, he must show by exhibit with his complaint what he had placed
> before  the  executive  committee,  either  by  specific  denials  or  by  specific  cross-
> complaint,  and  wherein  the  executive  committee  had  wrongfully  acted  or  failed
> to act on what he had thus placed before the committee for its determination and
> action.

*Darnell*, 202 Miss. at 775, 32 So. 2d at 686.   The statute thus assures that the special judicial

tribunal  will  not  "examine  into  matters  not  presented  by  the  original  contest  or  protest  before

the  executive  committee,  save  as  to  matters  germane  which  happened  during  or  since  the

hearing  before  the  executive  committee,  and  save  as  to  matters  merely  explanatory  or

incidental."   202 Miss. at 773, 32 So.2d at 685 (citing  *Harris v. Stewart*, 187 Miss. 489, 507,

193 So. 339 (1940)).   Stated clearly, we reasoned:

> It is plain enough on a careful analysis of Sec. 15, Chap. 19, Laws, 1935,
> Ex.Sess., Sec. 3182, Code 1942 [now Miss. Code Ann. § 23-15-927], that what
> the special tribunal created under that chapter is to hear and determine is in what
> respect  or  respects  the  party  'executive  committee  has  wrongfully  ***  denied
> the  relief  prayed  by  said  contest,'  meaning  of  course  the  contest  theretofore
> filed  by  the  contestant  with  and  before  the  executive  committee  under  Sec.
> 3143, Code 1942 [now Miss. Code Ann. § 23-15-921]. So it is then that Sec.
> 15, Sec. 3182 [now Miss. Code Ann. § 23-15-927], requires that the petition for
> a judicial review shall exhibit as an essential part of the petition a sworn copy
> of his protest or complaint theretofore made before the executive committee,
> from which it follows that if the contestant *made no protest or contest in
> writing before the executive committee*, there can be no jurisdiction in the
> special tribunal to review the action of the executive committee, and further that
> *unless a sworn copy of his said protest or contest before the executive
> committee is made a part of his petition for a judicial review, the said
> petition will present no cause of action for such a review*.

32 So. 2d at 685 (emphasis added).

¶23. It is thus abundantly clear that the Court in *Robinson* misinterpreted the above language from our decision in *Darnell*. All we said in *Darnell* was that the original contestee failed to file any *written* responsive pleadings before the party executive committee, and that since he failed to attach to his circuit court petition for judicial review a sworn copy of any pleadings he filed with the executive committee, the special tribunal had no jurisdiction to judicially review the action of the party executive committee. The Court in *Robinson* erroneously interpreted *Darnell* to require that a circuit court petition for judicial review must have attached a "copy of the sworn petition" filed with the party executive committee, as opposed to a "sworn copy of the petition."

¶24. Thus, while we agree with Waters that Miss. Code Ann. § 23-15-927 requires that a contestant file in circuit court a sworn petition for judicial review with certain attachments, including a sworn copy of his/her protest or petition which had been filed with the county executive committee, we part ways with Waters when she asserts that the protest or petition filed with the county executive committee must be sworn and that the subsequent filing of the petition for judicial review must have attached thereto a copy of the previously sworn petition filed with the county executive committee. Waters, like the Court in *Robinson*, misinterprets our decision in *Darnell* because she interprets Section 23-15-927 to require that there be attached to the petition for judicial review a "copy of the sworn petition" filed with the county executive committee. The statute does not require this. What is required to be attached to the petition for judicial review is "*a sworn copy*" of the petition filed with the county executive

19

committee, not a *"copy of the sworn petition"* filed with the county executive committee. If we accepted Waters's interpretation of Section 23-15-927 and our case law, we would in essence judicially abrogate Miss. Code Ann. § 23-15-921, which clearly does not require that a sworn petition be filed with the county executive committee. Further, Waters's interpretation of the statute would have us say that while Section 23-15-921 does not require that the petition filed with the county executive committee be sworn, that same petition has to be sworn when it is attached as an exhibit to the petition for judicial review which is subsequently filed in circuit court. This is an impossibility.

¶25.     Here is what Gnemi quite appropriately did in today's case. He filed his petition for judicial review in the Circuit Court of Holmes County. There were numerous attachments to the petition for judicial review, including his handwritten note of August 21, 2003, asking for a "recount," the circuit clerk's handwritten note of August 22, 2003, signed by both Waters and Gnemi, confirming that Gnemi had requested an examination of the ballot boxes, and Gnemi's unsworn handwritten protest which he signed and filed with the HCDEC on August 25, 2003. Also attached to the circuit court petition for judicial review is a "Verification" which states, "Personally came and appeared before me, the undersigned authority in and for the aforesaid jurisdiction, James "Danny" Gnemi, who being by me first duly sworn states on oath that the matters and things contained in the above and foregoing are true and correct to the best of his knowledge, information, and belief." This verification  was signed by Gnemi before the Chancery Clerk of Leake County, Mississippi and notarized by a Leake County deputy chancery clerk.

20

¶26. In this case, we can thus state with confidence that Gnemi unquestionably complied with the provisions of Section 23-15-927, and our applicable case law, in that he attached to his circuit court petition for judicial review a "sworn copy" of the unsworn petition which he had filed with the HCDEC. By so doing, the special tribunal was empowered with jurisdiction to hear the case and was clearly informed of the issues which Gnemi wanted the special tribunal to review.

¶27. Accordingly, we today expressly overrule *Robinson*, and to the extent that *Miller* can be interpreted to have been decided based on *Robinson*, we likewise overrule *Miller* to that limited extent.

¶28. Thus, this assignment of error is wholly without merit.

### B. Was Gnemi's circuit court petition for judicial review properly sworn?

¶29. Waters asserts that the oath attached to Gnemi's petition for judicial review was insufficient as filed. Specifically, Waters directs our attention to the "Verification" discussed *supra*, and argues:

> Gnemi further failed to swear to the petition for judicial review when filed. His attorney signed the complaint, as any other civil action, on September 23, 2003. A document purporting to be a "Verification" recited that James Gnemi on oath stated that the matters and things in the said petition were true and correct, upon information and belief – on September 22, 2003, by a separate document attached to the said petition, which was dated September 23, 2003.[16]

---

[16]Evidently, one of Waters's concerns about the verification is the fact that Gnemi signed the verification a day before his attorney signed the petition for judicial review to which the verification is attached. While Waters offers authority to generally attack the verification attached to the petition for judicial review, she offers no authority to show us why Gnemi's verification is fatally defective because it contains a date different than the date of the petition. Waters's failure to cite any authority to support a particular

21

¶30.     In support of this argument, Waters cites *Fillingane v. Breland*, 212 Miss. 423, 54

So.2d 747 (1951), a case where this Court addressed the verification of a primary election

contest petition.    In *Fillingane*, Breland and Fillingane ran in the Democratic primary for

District Five Supervisor in Perry County.    Breland received 171 votes and Fillingane received

170 votes.    Fillingane promptly wrote the county executive committee requesting that the

committee investigate certain irregularities and declare a new election.    Fillingane then filed

a sworn petition of protest with the county executive committee,[17] again asserting

irregularities, including an incident where a ballot was allegedly marked with an ordinary lead

pencil.    On Breland's motion, the county executive committee dismissed Fillingane's petition,

whereupon Fillingane then filed a sworn petition for judicial review, which petition "carried

forward" the assertions contained in his initial petition filed with the county executive

committee.    Likewise, Fillingane attached to his sworn petition for judicial review, a certified

copy of his original protest as well as the proceedings before the county executive committee.

Fillingane's petition for judicial review contained an oath or verification similar to the

verification in the case sub judice in that Fillingane signed an oath which, inter alia, stated that

---

proposition precludes this Court from being able to consider and address the issue on appeal.    *Lauro v. Lauro*, 847 So.2d 843, 851 (Miss. 2003); *Grey v. Grey*, 638 So.2d 488, 491 (Miss. 1994).

[17]Fillingane did more than the statute required in filing a sworn petition before the county executive committee.    In fact this Court, in *Fillingane*, stated, inter alia: "The original protest [filed before the county executive committee] was similarly verified, so that we need not decide whether it was required to be sworn to, or whether the 'sworn copy' of the protest required on appeal relates to the protest as originally filed." 212 Miss. at 436, 54 So.2d at 749.    We are confident that had this Court, in *Fillingane*, deemed it necessary to address this issue, we would have determined that the statute clearly does not require that the original petition or protest filed with the county executive committee be sworn.

"the matters and things set forth in this petition......are true and correct to the best of his knowledge, belief and information." While the special tribunal made certain factual findings based on Fillingane's allegations, the tribunal dismissed the petition because it was not "a sworn petition under Code 1942, Section 3182."[18] 212 Miss. at 435, 54 So.2d at 748-49. In reversing the special tribunal's dismissal, we quoted from Griffith's Chancery Practice, Section 175, and stated:

> "The correct allegation must be not less positive than this: The complainant has been informed and believes, and upon such information and belief charges the facts to be, stating them as facts, or it may be stated thus. Complainant charges, as he is informed and believes, stating the facts charged." This section is documented by cases involving the Code section just referred to, and therefore states a rule more stringent than that which is applicable to the sufficiency of the oath considered apart from the statute. It will be seen that the affiant states that the allegations of the petition are true and correct. Its efficacy is not impaired by adding that the assurance of such truth is derived from belief or information as indeed are most assertions of fact. Our conclusion could, if necessary, take reinforcement from Section 3158 which requires "an ordinary and reasonable construction * * * to accomplish its purposes."

212 Miss. at 436, 54 So.2d at 749. Finally in *Fillingane*, we stated the verification of the petition for judicial review "could not well have been more definite and we hold that it need not have been." *Id.*

¶31. Thus, consistent with *Fillingane*, Gnemi's verification attached to his petition for judicial review was more than adequate and in compliance with the applicable provisions of Miss. Code Ann. § 23-15-927 (Rev. 2001).

¶32. Accordingly, this issue is without merit.

---

[18]This 1942 code section was the predecessor statute to Miss. Code Ann. § 23-15-927.

### C. Was Gnemi's circuit court petition for judicial review properly certified by two practicing attorneys?

¶33. Waters next claims that Gnemi's petition for judicial review lacked the proper accompanying certificates from two practicing attorneys. The applicable statute states in relevant part:

> [S]uch petition for judicial review shall not be filed unless it bear the certificate of two (2) practicing attorneys that they and each of them have fully made an independent investigation into the matters of fact and of law upon which the protest and petition are based and after such investigation they verily believe that the said protest and petition should be sustained and that the relief therein prayed should be granted.........

Miss. Code Ann. § 23-15-927. This statutory requirement furthers the goal contemplated by the legislature in its promulgation of Section 23-15-927. Accordingly, it provides yet another express obstacle to the initiation of frivolous partisan litigation. In *Harris v. Stewart*, 187 Miss. 489, 193 So. 339 (1940), this Court discussed this statutory requirement, stating:

> [T]he evident and material purpose of the requirement of the certificate of two independent practicing attorneys was to prevent, or at least to minimize, the bringing before the courts of captious or unsubstantial political contests of primary elections,--that such a certificate would dependably show that there was real merit from a substantial legal standpoint in the proposed contest, and would tend to forestall, in a large measure, spiteful partisan litigation which would needlessly cast doubt upon the future title of the successful candidate to the nomination for the public office involved.

193 So. at 343.

¶34. This two-practicing attorney requirement has been strictly construed and held to be jurisdictional. In *Pearson v. Jordan*, 186 Miss. 789, 192 So. 39 (1939) we cited our decision

24

in ***Pittman v. Forbes, Miss.***, 186 Miss. 783, 191 So. 490 (1939) and once again stated, "that the certificate should be signed by unbiased lawyers; and that 'Such a purpose eliminates attorneys who represent a contestant at the time their investigation of the matter is made, or at the time his petition for a judicial review is filed.'" ***Pearson***, 192 So. at 40. In dismissing the petition for judicial review in ***Pearson***, we held the statutory certificate of two disinterested practicing attorneys to be jurisdictional:

> It follows, therefore, that the special tribunal was without jurisdiction to hear and determine the cause; and that this Court is therefore without jurisdiction to hear it on appeal. The statute is mandatory, using as emphatic language as could be employed, under the circumstances
>
> *******************
>
> The right of a contestee to an office to some extent is tainted by the proceeding; and it is important that this independent investigation should be made by disinterested attorneys, having no connection with the case. The certificate of the two disinterested attorneys is just as important as the petition itself, and is jurisdictional.

*Id.*

¶35. While Waters has submitted the issue and the appropriate rule for our review, she has failed to support her contention with any evidence of a failure on the part of Gnemi to meet the statutory mandate. Attached to Gnemi's petition are two separate certificates, each signed by a different attorney. Other than the name of the attorney, the attorney's Mississippi Bar number, and the attorney's mailing address, both certificates are identical. Each certificate states that the attorney is a licensed and practicing attorney in the state of Mississippi and that:

1. I have fully made an independent investigation into the matters of fact and of law upon which the foregoing protest and petition are based; and,

25

2.  After such investigation, I verily believe that the protest and petition should be sustained and that the relief therein prayed should be granted.

The language of paragraphs one and two of the attorneys' certificates is identical to the language of the statute. We are at a total loss as to what else Waters believes these two attorneys and Gnemi could have done, or should have done, to strictly comply with the pertinent provisions of Miss. Code Ann. § 23-15-927 regarding the attorneys' certificates.

Moreover, the record evidences not only that two attorney certificates were attached in support of Gnemi's petition but that such submissions were made by disinterested attorneys based on independent investigation.

¶36.   We thus find this issue to be without merit.

### D.   Was Gnemi's circuit court petition for judicial review properly accompanied by the required cost bond?

¶37.   Waters asserts that Gnemi's cost bonds fail to meet the statutory requirements. Miss. Code Ann. § 23-15-927 states in pertinent part:

> [T]he petitioner shall give a cost bond in the sum of Three Hundred Dollars ($300.00), with two (2) or more sufficient sureties conditioned to pay all costs in case his petition be dismissed, and an additional bond may be required, by the judge or chancellor, if necessary, at any subsequent stage of the proceedings.

Waters's specific complaints are that "none of [the cost bonds] bear the approval of the clerk, and all three bear dates different from the petition, the first being dated September 22, 2003, the third being dated September 19, 2003, and the second not being signed at all by Gnemi." Additionally, Waters asserts that Gnemi filed his cost bond in piecemeal fashion, with some of the pages being facsimile copies. Collective Exhibit 14 attached to the petition for judicial

26

review consists of: First page – Cost Bond in the amount of $300.00, with the required statutory language, signed by Gnemi and Holt Smith as surety. The other signature line for a surety contains no signature but does have typed on the line "See Attachment." This document is a facsimile copy and is dated September 22, 2003. Second page – Bond for Costs (in the amount of $300.00) setting out that Gnemi is the principal and Travelers Casualty and Surety Company of America, Hartford, Connecticut, is the surety, and again there appears the statutory requirement concerning the conditions of the bond. There is a signature line for Gnemi, with a check mark, but no signature. On the signature line for an attorney-in-fact and Mississippi Resident Agent for Travelers appears the signature of "Anita Johnson." The signature line for approval by a circuit judge is blank. This document is dated September 19, 2003. Third page – This is a facsimile copy of the second page, except that Gnemi's signature appears on this page. Again, the signature line for approval by a circuit judge is blank. Fourth and Fifth pages – Power of Attorney and Certificate of Authority of Attorney(s)-In-Fact. This document authorizes three individuals, including Anita Johnson, to bind Travelers in an amount not to exceed $500,000.00 by the execution of various instruments, including bonds. This document is signed under oath by George W. Thompson, Senior Vice President for Travelers, and contains four corporate seals of the Travelers entities, along with the signature, commission expiration date and seal of a notary public. This document was also certified as remaining in full force and not revoked, as indicated by the signature of Kori M. Johnson, Assistant Bond Secretary for Travelers, and again reflecting Travelers's four corporate seals. Johnson's certificate is dated September 19, 2003.

27

¶38. With this documentation before her, Waters asserts that Gnemi failed to comply with the cost bond requirements of the statute. Waters's sole citation to authority on this issue is a quote from *Pearson* that "[t]he statute is mandatory, using as emphatic language as could be employed, under the circumstances." 192 So. at 40. In *Pearson*, this Court affirmed the special tribunal's dismissal of the petition for judicial review due to the contestant's failure to strictly comply with the statutory requirement of obtaining certificates from two disinterested attorneys. We agree with the assertion that Miss. Code Ann. § 23-15-927 is mandatory and must be strictly construed; however, *Pearson* offers nothing by way of discussion of the cost bond requirements of the statute, and thus does little to guide us in considering the issue of whether Gnemi's cost bond was somehow statutorily deficient. From the record before us, we unhesitatingly find that Gnemi complied with the statutory requirements concerning the cost bond.

¶39. As an aside, we also note from the record that the circuit clerk accepted and marked as filed Gnemi's petition for judicial review, with the attached fourteen exhibits, which included the cost bond. The record is silent as to any attack of the cost bond by anyone at the trial court level. We find nothing in the record which indicates that Judge Smith was ever called upon to rule on the sufficiency of the cost bond. We have been consistent in holding that we need not consider matters raised for the first time on the appeal, which practice would have the practical effect of depriving the trial court of the opportunity to first rule on the issue, so that we can then review such trial court ruling under the appropriate standard of review. *See, e.g., Triplett v. Mayor & Aldermen of Vicksburg*, 758 So.2d 399, 401 (Miss. 2000) (citing *Shaw*

28

*v. Shaw*, 603 So.2d 287, 292 (Miss. 1992)). If we were to adopt such a practice of considering for the first time on appeal matters not raised before the trial court, such practice would have the chilling effect of depriving the trial court of the opportunity to first rule on the issue, which would then deprive this Court of the opportunity to perform our mandated appellate review by utilizing the appropriate standard of review of the trial court's ruling.

¶40. For all these reasons, we find this issue to be without merit.

### E. Were Gnemi's pleadings sufficient to maintain his action with the special tribunal?

¶41. Waters also challenges the ruling of the special tribunal by asserting that Gnemi's petition for judicial review exceeded the scope of the matters alleged in his original petition to the HCDEC. In *Darnell*, this Court recognized the scope of the issues authorized by statute for a special judicial tribunal to review:

> [T]he special judicial tribunal will have no authority to review or examine into matters not presented by the original contest or protest before the executive committee, save as to matters germane which happened during or since the hearing before the executive committee, and save as to matters merely explanatory or incidental as mentioned in *Harris v. Stewart*, 187 Miss. 489, 507, 193 So. 339. And we have consistently held that the protest before the executive committee must show specifically, and not by generalities, what wrong or wrongs or illegalities the contestant complains of, and that thereby a wrong was done him in declaring his opponent the party nominee. See for instance, *Hickman v. Switzer*, 186 Miss. 720, 191 So. 486.

202 Miss. at 773, 32 So. 2d at 685.

¶42. This Court has expressly defined the guidelines for a contestant when appealing an executive committee determination to a special judicial tribunal and in *Harris*, we opined that

29

while a petition may not assign additional causes of action, it may be both amendatory, as to the original causes of action and grounds for relief, and supplementary, as to all those material facts which happened during and since the hearing before the executive committee. 193 So. at 343. In *Harris*, we cited directly from precedent and stated that "[w]hen the main facts are set out in the original pleading, and an amendment is made which merely elaborates upon those facts and sets forth additional incidental facts not changing the original picture presented, although those incidental facts may be necessary, in point of strict law, to the statement of a good cause of action, the amendment introduces no new cause." *Id.* at 344 (citing *Illinois Cent. R. Co. v. Wales*, 177 Miss. 875, 889, 171 So. 536, 539 (1937)).

¶43. In this case, Gnemi originally alleged in his written petition to the HCDEC that there were fundamental problems with the conduct of the primary election. Moreover, his original petition of August 25 not only placed the issue of ballot box security in violation of Miss. Code Ann. § 23-15-911(1) squarely before the HCDEC, it also contested the election officials' failure to count approximately five absentee ballots which Gnemi claimed were valid. Furthermore, Gnemi complained of Roy Anderson's third party candidacy in the Holmes County, District 3 primary, asserting that he did not maintain residency there, and he likewise alleged that the HCDEC's cancellation of the second primary election, where Gnemi apparently prevailed, was invalid.

¶44. Tracking these initial complaints, Gnemi's circuit court petition for judicial review asserts the same fundamental causes of action. Moreover, Gnemi includes claims for ballot box irregularity, failure to count valid absentee ballots, improper cancellation of the second

30

primary election held on August 26, 2003, and Roy Anderson's alleged non-residency in District 3. The only additional claims arise out of the same fact issues asserted in his petition to the HCDEC. Furthermore, the only additional facts included by Gnemi in his petition for judicial review were those regarding alleged election-day irregularities at the polls - an issue discarded by the special tribunal.

¶45. The dispositive issue in this case concerning control of the ballot boxes and their contents was asserted in both the HCDEC petition and the circuit court petition for judicial review, and, as such, was well within the scope of Judge Smith's review of the actions of the HCDEC. This issue is thus without merit.

¶46. In sum, we find that Gnemi's petition filed with the HCDEC did not have to be sworn and was otherwise in proper form; that Gnemi's petition for judicial review filed with the circuit court was properly sworn; that there were attached to Gnemi's petition for judicial review the certificates of two disinterested attorneys, in proper form; that Gnemi's petition for judicial review was accompanied with a proper cost bond; and, that Gnemi's pleadings via the petition for judicial review were more than sufficient to maintain his action before the special tribunal. Thus, for these reasons, we find that the special tribunal had jurisdiction to consider Gnemi's properly filed circuit court petition for judicial review; therefore, Issue I is without merit.

## II. WHETHER THE SPECIAL TRIBUNAL PROPERLY DETERMINED THAT A SPECIAL PRIMARY ELECTION SHOULD BE CONDUCTED.

31

¶47. Waters asserts that the special tribunal committed reversible error in finding that there was such a radical departure from our election laws by the HCDEC so as to require a special primary runoff election between Waters and Gnemi.

## A. Whether there were violations of Mississippi Election Laws?

¶48. The crux of this case involves Gnemi's allegations concerning the HCDEC's method of handling the District 3 precinct ballot boxes after the first primary election.

¶49. Gnemi testified at the special tribunal hearing that when he and Waters appeared at the courthouse for the examination of the ballot boxes on August 22, 2003, instead of being presented with the six metal precinct boxes, safely secured with metal locks, they were presented with two cardboard boxes with the election materials from all six precincts commingled in those two boxes. When Gnemi made inquiry as to why the election materials were not in the metal precinct boxes, Hart informed him that the Election Commission members had emptied the contents of the six precinct metal boxes from District Three into the cardboard boxes because the metal boxes were needed for the second primary election to be held on August 26, 2003. Evidently the election materials were at least identifiable by precinct because Gnemi testified that during the course of the ballot box examination, as the examination of the materials from each precinct was concluded, Hart placed these materials in the appropriate metal precinct box and secured the box with double locks.

¶50. Wilbur Redmond, the District Three Election Commissioner for Holmes County, testified that he assisted in the conduct of the August, 2003 primary elections. This fact becomes significant since, absent an express agreement to the contrary, it is the county party

32

executive committee, not the county election commission, which is charged by law with the responsibility of conducting the primary elections. On this point, Redmond testified:

> Q. Tell us just a little bit about your duties briefly as an Election Commissioner?
>
> A. My duties are to get the boxes ready for and conduct election – general election and special election. Pulling the voter rolls. Uh, that's about it.
>                         ***************
> Q. What department or organization runs primary elections? Who is responsible for that?
>
> A. The Holmes County Democratic Executive Committee.
>
> Q. To your knowledge, does the Democratic Executive Committee have any kind of written agreement with the Elections Commission regarding the ballot boxes for the primary election?[19]
>
> A. Not to my knowledge. I don't know whether they have a written agreement or anything. It's just common knowledge that the Election Commissioners are the ones in charge of the voting boxes.

¶51. Redmond testified that on August 17, 2003, he received a telephone call from fellow Election Commissioner Chairman Sam Jesse Horton to come to the courthouse the next day to prepare for the second primary elections. The next day Redmond and other election commissioners indeed met at the courthouse to clean out the ballot boxes. The county election commissioners brought the metal precinct ballot boxes from a storage room[20] to another room in the courthouse, at which time each election commissioner proceeded to clean out the ballot boxes from his/her respective supervisor's district. Thus, Redmond handled the

---

[19]*See* Miss. Code Ann. § 23-15-266 (Rev. 2001).

[20]The record reveals that at least several election commissioners had keys to this storage room.

33

six metal ballot boxes from District Three, which included two boxes from Pickens, two boxes from Goodman, and one box each from Ebenezer and Coxburgh. No members of the HCDEC were present during this process. Redmond explained what he did:

Q. All right. Tell me what you had to do to go about taking the ballots out of their original boxes?

A. We have to break the seal on them and then open them and take out the material that's in them.

Q. And what kind of seal is this?

A. That's a metal seal.

Q. What's the purpose of that metal seal?

A. Well, to keep the boxes secure.

Q. What happened after you broke the seal on the boxes?

A. Well, I was taking the material out, the ballots that had been cast on August the 5th, and other stuff that they need to conduct an election.

Q. What would some of that other stuff be?

A. Well, pencils, uh, tape, uh, election materials, poll books, and all of that.

*************

Q. What did you do after – where did you take that material – where did you put it?

A. Well, I had picked up – since I knew we was going to been (sic) cleaning out the boxes, I had picked up some cardboard boxes from over there at the farmer's market......

¶52. Redmond further testified that he cleaned out the metal precinct boxes and placed all the election materials into the two cardboard boxes he had picked up at the farmer's market. At the special tribunal hearing, he identified these two cardboard boxes, but stated they had

34

more tape on them than what he had placed on them in order to "secure" the contents. Redmond also testified that he secured the cardboard boxes by pulling the flaps down and securing them with "one or two pieces" of gray masking tape across the top. Some of the election commissioners then placed their signatures, as witnesses, on the cardboard boxes. Redmond in fact signed written certificates, one for each cardboard box, confirming that the cardboard boxes contained materials which he had removed from the precinct boxes in preparation for the second primary elections. Each certificate was then placed on the respective cardboard box, and Redmond then placed the cardboard boxes back in the storage room at the courthouse. Redmond stated that this storage room remained locked "most of the time." Redmond confirmed that this method of cleaning out the metal boxes on August 18, 2003, was one which the election commissioners had utilized many times in preparation for a second primary election. Redmond stated that upon returning to the courthouse on August 21, 2003, he learned that Gnemi had requested a "recount." Redmond also testified as to what he observed concerning the actions of the circuit clerk and some of the election commissioners:

Q. Why were they putting additional tape on the boxes?

A. Because when they moved them out of the storage room, those boxes had to be brought out here wherever they were going to have the recount. They had to be turned back over to the Democratic Executive Committee.

Q. So what was –

A. Well, we had – we couldn't turn them back to the Democratic Executive Committee with the boxes – in the boxes that they had been put in at the

35

beginning. So, they – since they had been moved and put in another box, they had to get them out and put them in this box and put more tape on them.

Q. Why did they have to put more tape on them? Is that because –

A. Well, my understanding, it was a hazard. It wasn't secured enough in order to be moved around. That's my thoughts about it.

Redmond also stated that if the storage room they normally used got "filled up," then a basement storage room would be used to store election materials.

¶53. Of equally significant import is the testimony of Earline Wright-Hart, the Holmes County Circuit Clerk. Hart testified that she learned the overvote and undervote had indeed been factored into calculating the percentages in the District Three first primary election about a week and a half before the second primary, when she received a call from the Secretary of State's office. A fax transmission later arrived at her office from the Secretary of State's office, addressed to Elma Maxine Smith, the HCDEC chair. This fax transmission contained information as to how to correctly calculate the vote percentages, excluding the over and under votes. Hart passed this information on to Smith who in turn convened a meeting of the HCDEC, which certified Waters as the Democratic nominee for District Three Supervisor.

¶54. Hart testified that Gnemi then requested a box examination, and Hart told Gnemi she would arrange for the box examination the next morning by contacting the election commissioners; however, she also stated that "since I do not handle the boxes, I didn't know where the boxes were" because "[t]hat's not in my post." Hart stated that she did not keep the boxes in the clerk's office. In fact, in the late afternoon before the election, according to Hart,

the cardboard boxes were moved "by a trustee" from one room at the courthouse to another room in anticipation of the box examination the next morning. Hart further testified:

> Q. Because it's not – the Circuit Clerk's office does not run these primary elections. The Democratic Executive Committee runs these elections, correct?
>
> A. That's correct.
>
> Q. And you don't have a written agreement with the Democratic Election – I mean, Executive Committee to run these elections?
>
> A. I've been here 20 years. I've never had to have a written agreement for an election.
>
> Q. But you don't have a written agreement with the Democratic Executive Committee to run the election – primary election?
>
> A. No, there's no – nothing in the law that says I have to have that.
>
> Q. In fact, you mentioned the law, and that's a good point. Regarding the law, it is the Democratic Executive Committee's job to run the primary election and not yours?
>
> A. That's right.

¶55. Finally, Hart admitted that after the first primary election for District Three supervisor, the HCDEC certified the results and declared a second primary between Waters and Gnemi. Hart also admitted that notwithstanding this HCDEC certification, Waters was later declared to be the Democratic nominee on August 21, just five days before the scheduled second primary, without Waters ever requesting an examination of the ballot boxes and without her ever filing an election contest. In essence, such action by the HCDEC was unilateral.

¶56. In fact, Waters candidly admitted that she called both the Mississippi Democratic Party state office and the Secretary of State's office. From these phone conversations, certain

information was eventually communicated to both Hart and Smith, the HCDEC chair. Waters testified that there was never any reason for her to request an examination of the ballot boxes or to file an election contest because she was declared to be the Democratic nominee after she initiated the phone calls to the state Democratic Party headquarters and the Secretary of State's office.

¶57. There are several statutes which specifically address ballot box security. As such, each statute is premised on eliminating fraudulent or corrupt practices and insuring a just and trustworthy result. Ballot box security is essential to producing an election result in which not only the voters, but the candidates themselves, can be confident. Miss. Code Ann. § 23-15-591 governs the immediate post-election handling of ballot boxes by precinct poll managers. Specifically, section 23-15-591 requires that, "[w]hen the count of the votes and the tally thereof have been completed, the managers shall lock and seal the ballot box, having first placed therein all ballots voted, all spoiled ballots and all unused ballots." Miss. Code Ann. § 23-15-911(1) outlines the procedure for maintaining ballot box security both before and after a candidate exercises the right to examine the ballot boxes. Section 23-15-911(1) specifically provides:

> When the returns for a box and the contents of the ballot box and the conduct of the election thereat have been canvassed and reviewed by the county election commission in the case of general elections or the county executive committee in the case of primary elections, all the contents of the box required to be placed and sealed in the ballot box by the managers shall be replaced therein by the election commission or executive committee, as the case may be, and the box shall be forthwith resealed and delivered to the circuit clerk, who shall safely keep and secure the same against any tampering therewith. At any time within twelve (12) days after the canvass and examination of the box and its contents

38

by the election commission or executive committee, as the case may be, any candidate or his representative authorized in writing by him shall have the right of full examination of said box and its contents upon three (3) days' notice of his application therefor served upon the opposing candidate or candidates, or upon any member of their family over the age of eighteen (18) years, which examination shall be conducted in the presence of the circuit clerk or his deputy who shall be charged with the duty to see that none of the contents of the box are removed from the presence of the clerk or in any way tampered with. Upon the completion of said examination the box shall be resealed with all its contents as theretofore. And if any contest or complaint before the court shall arise over said box, it shall be kept intact and sealed until the court hearing and another ballot box, if necessary, shall be furnished for the precinct involved.

Quite often, an aggrieved candidate will demand a "recount." Simply put, our election laws do not provide for a candidate seeking a recount by a county party executive committee or a county election commission, as the case may be. Instead section 23-15-911(1) is the mechanism by which an aggrieved candidate may gain information to aid the candidate in determining whether there might be sufficient evidence to file a contest, first with the party executive committee or the election commission.

¶58. Finally, Miss. Code Ann. § 23-15-595 states in pertinent part:

[The circuit] clerk shall, in the presence of the manager making delivery of the box, place upon the lock of such box a metal seal similar to the seal commonly used in sealing the doors of railroad freight cars. Such seals shall be numbered consecutively to the number of ballot boxes used in the election in the county, and the clerk shall keep in a place separate from such boxes a record of the number of the seal of each separate box in the county.

¶59. Although most ballots are now centrally counted at the courthouse via a scanning machine at least similar to the OMR in today's case, as opposed to counting by the poll workers at the precincts with subsequent delivery of the ballot boxes and election materials to the circuit clerk, our election statutes give clear guidance to our elections officials

39

regarding their respective duties. We can state with certainty that in the case sub judice, several violations of election laws occurred concerning the August, 2003 first primary election in Holmes County for District Three Supervisor. First, the Circuit Clerk testified that she did not take possession of the ballot boxes the night of the election when the returning poll managers brought them back from the precincts. In fact, she was adamant that she was not in receipt of any of the boxes that evening. Furthermore, the circuit clerk maintains that she had no knowledge of the boxes' locale up to the time when Gnemi officially served notice on her and exercised his statutory right to examine the ballot boxes on August 21, 2003. Ultimately, the Holmes County Circuit Clerk verified her lack of participation in regards to ballot box security and expressly stated that she lacked any personal knowledge of and was not a witness to the removal of the contents from the six District Three precinct ballot boxes, or their collective dumping into two taped cardboard boxes.

¶60. In accordance with section 23-15-911(1), the ballot boxes should have been pristinely maintained and monitored by the circuit clerk who had a duty to safely keep and secure the ballot boxes against any tampering both before and after any box examination. However, as evidenced by the record, section 23-15-911(1) was unquestionably violated when, on August 18, 2003, Wilbur Redmond cleaned out the six District 3 ballot boxes and placed the contents into two cardboard boxes sealing the two boxes with a single piece of tape.

¶61. Importantly, the cardboard boxes were never sealed. Statutory mandate prescribes that the ballot boxes be sealed immediately following an election in order to preserve the election-day results. In this case, the boxes, which may have been sealed at one time, were not only left

40

unsealed and accessible, but their contents were commingled with the contents of the other District 3 boxes. When the circuit clerk finally took possession of these cardboard boxes on August 22, she proceeded to add additional tape to their exterior fearing that the security of the ballots was unsatisfactory. Unfortunately, the taping did nothing to cure the inappropriate handling of the ballot boxes prior to that time.

¶62. In his ruling, Judge Smith, found these actions to be a clear deviation from our election laws, relying on *Allen v. Funchess*, 195 Miss. 486, 15 So. 2d 343 (1943). In *Allen*, the contestant in an election contest challenged the integrity of the official vote count because two ballot boxes remained unsealed after the executive committee made its initial box examination. 15 So. 2d at 344. The contestant maintained that after the county executive committee's post-primary examination of the ballot boxes, "the boxes and their contents thereupon had lost their integrity in point of having any evidentiary value at the time the examination and recount was made on August 31st." *Id*. This Court further stated in *Allen* that "[h]ad these boxes been sealed, as required by the statute, it is entirely probable that this unfortunate controversy would never have proceeded to the course of an expensive litigation with its residue of doubts which will inevitably linger and rankle." *Id*.

¶63. Similarly, in the case at bar, the evidentiary value of the sealed ballot boxes was lost the moment the seal was broken on the ballot boxes. Moreover, like *Allen*, the contents were exposed and made available for fraudulent practices.

¶64. In sum, we are constrained as a matter of law, based on the record before us, to find that there were numerous violations of our election laws. First of all, the Holmes County Election Commission was in complete control of the ballot boxes in the August 5, 2003, Democratic primary election, even though our law requires such ballot box control to be maintained by the county executive committee in the case of primary elections. *See* Miss. Code Ann. § 23-15-911. Such relinquishment of statutory responsibility by the Holmes County Democratic Executive Committee could have only been legally accomplished via a written agreement with the Holmes County Election Commission. Miss. Code Ann. § 23-15-266 (Rev. 2001) states:

> A county or municipal executive committee shall be eligible to enter into written agreements with a circuit or municipal clerk or a county or municipal election commission as provided for in Sections 23-15-239(2), 23-15-265(2), 23-15-267(4), 23-15-333(4), 23-15-335(2) or 23-15-597(2), only if the political party with which such county or municipal executive committee is affiliated:
>> (a) Has cast for its candidate for Governor in the last two (2) gubernatorial elections ten percent (10%) of the total vote cast for governor; or
>> (b) Has cast for its candidate for Governor in three (3) of the last five (5) gubernatorial elections twenty-five percent (25%) of the total vote cast for Governor.

The record is devoid of any evidence of a written agreement between the HCDEC and the election commission wherein the HCDEC has divested itself of its statutory duties in the conduct of Democratic primary elections. In fact, both District Three Election Commissioner Wilbur Redmond and Circuit Clerk Earline Wright-Hart admitted the non-existence of a written agreement. Thus, pursuant to Miss. Code Ann. § 23-15-267(3), the HCDEC, not the county election commission, should have taken control of the ballot boxes and delivered them

42

to the circuit clerk. Because of this active involvement by the Holmes County Election Commissioners in the August 5, 2003, first Democratic primary, Judge Smith was unable to convene the special tribunal as required under the provisions of Miss. Code Ann. § 23-15-931. Pursuant to this statute, upon appointment of a chancellor or circuit judge by the Chief Justice pursuant to Miss. Code Ann. § 23-15-929, the specially appointed judge or chancellor is to convene the special tribunal consisting of the judge and the five county election commissioners, who presumably are unbiased and disinterested persons, having no involvement in the conduct of the primary election being contested. Pursuant to section 23-15-931, the county election commissioners sit with the judge or chancellor "as advisors or assistants in the trial and determination of the facts." Further, Miss. Code Ann. § 23-15-933 provides, inter alia, that if as many as three of the five county election commissioners are in attendance at the hearing before the special tribunal, and if the findings of fact by the special tribunal are concurred in by all the county election commissioners in attendance, such findings of fact are not subject to appellate review. However, inasmuch as the actions of the county election commissioners are at the crux of today's election contest, Judge Smith was unable to utilize their services as members of the special tribunal. However, we have held that the absence of the election commissioners at a primary election contest before the specially appointed judge is not error under certain circumstances. *See Hatcher v. Fleeman*, 617 So.2d 634, 638 (Miss. 1993). In fact, Miss. Code Ann. § 23-15-935 (Rev. 2001) gives the duly appointed judge or chancellor the express authority to proceed to a hearing without the county election commissioners, under certain circumstances. However, what was lost, inter alia, because of

43

the inability of the election commissioners to serve as members of the special tribunal in today's case, was expedited review by this Court without a record if all the election commissioners had agreed with the special tribunal's findings of fact.

¶65. Another critical violation is the circuit clerk's relinquishing her statutorily mandated duties to take charge of the ballot boxes after the completion of the OMR counting process which was completed in the early morning hours of August 6, 2003. *See* Miss. Code Ann. §§ 23-15-267(3), -911(1). Instead the ballot boxes were kept in various storage rooms at the courthouse, and after the county election commissioners improperly dumped the contents of the six precinct ballot boxes from District Three into two non-secured cardboard boxes from the farmer's market, a "trustee" (which we presume to be a jail trusty), among other persons, moved these cardboxes around from one room to another at the courthouse.

¶66. Likewise, of significant import in today's case is that, notwithstanding the fact that the provisions of Miss. Code Ann. § 23-15-911(1) allow an aggrieved candidate to examine the ballot boxes within twelve (12) days after the canvass and examination of the boxes and contents by the county executive committee, the county election commissioners, only six days after the HCDEC certification of the first primary elections, removed the contents of the six District Three ballot boxes and placed them into non-secured cardboard boxes. This action by the county election commissioners destroyed the opportunity for not only Gnemi, but any candidate for a District Three office, or a county-wide office, in the August 5th primary, to exercise his or her statutory right to examine the ballot boxes pursuant to Miss. Code Ann. § 23-15-911(1). As so noted by Judge Smith in his bench opinion and his written order,

44

because of these blatant violations of various statutes, the integrity of any ballot box examination was compromised because of the manner in which these six precinct ballot boxes were handled from the time of the first primary election until Gnemi attempted an examination.

¶67. Waters understandably cites *Riley v. Clayton*, 441 So.2d 1322 (Miss. 1983), in an effort to convince us that the use of cardboard boxes to store ballots was sufficient to save today's case. However, *Riley* is unequivocally factually dissimilar to the case sub judice. In *Riley*, a primary election contest in the chancery clerk's race, the Lee County circuit clerk had for some time followed the practice of storing absentee ballots in large brown precinct envelopes.[21] However, unlike today's case, in *Riley*, the ballots which were placed in the envelopes were kept at all times in a secured location in the circuit clerk's office, which was locked overnight.

¶68. Thus, for these reasons, we find that the Holmes County election officials committed numerous violations of the election laws.

### B. Whether the special tribunal's ordering a special primary run-off was the proper remedy?

¶69. In his written order, Judge Smith held in relevant part "that the violation of Miss. Code Ann. § 23-15-911 is a total departure from the mandatory provisions of the statute." This finding was likewise consistent with his bench opinion. Judge Smith determined that the only

---

[21]Lee County utilized voting machines on election day, thus absentee ballots and affidavit ballots were the only paper ballots used in Lee County elections.

appropriate remedy was to order a special primary run-off election be to held between Gnemi and Waters on December 16, 2003, in order to determine the Democratic primary nominee. Judge Smith also ordered a special general election to be held on January 6, 2004, between the Democratic nominee emerging from the special primary run-off and the Independent candidates.

¶70.    In *Riley*, we stated:

> The key in deciding whether an act not in strict compliance with the statutory election procedures renders that election void is whether the act is such a total departure from the fundamental provisions of the statute as to destroy the integrity of the election and make the will of the qualified electors impossible to ascertain. *Ulmer v. Currie*, 245 Miss. 285, 147 So.2d 286 (1962); *Sinclair v. Fortenberry*, 213 Miss. 219, 56 So.2d 697 (1952); *Gregory v. Sanders*, 195 Miss. 508, 15 So.2d 432 (1943).

441 So.2d at 1328.

¶71.    Ordering a special election is indeed an extraordinary remedy and requires a careful balancing of many competing factors. In *Noxubee County Democratic Executive Committee v. Russell*, 443 So. 2d 1191 (Miss. 1983), we addressed this issue, and set forth a two-pronged test:

> When an election has been successfully contested, this Court has employed different tests over the years to aid its determination of what form of relief is in order.[]   By various routes, we have attempted to discern whether the entire election should be thrown out or only the tainted votes. We have employed a two pronged test which though it has been stated in different ways, essentially provides that special elections will be required only when (1) enough illegal votes were cast for the contestee to change the result of the election, or (2) so many votes are disqualified that the will of the voters is impossible to discern.[]

46

*Russell*, 443 So. 2d at 1197 (citing *Walker v. Smith*, 213 Miss. 255, 56 So.2d 84, suggestion of error, 215 Miss. 263, 264, 57 So. 2d 166, 167 (1952); *Pyron v. Joiner*, 381 So.2d 627 (1980)). *See also*, footnotes 1 and 2, 443 So.2d at 1197-98. Stated differently, this Court has determined that in an election contest, when a significant number of legal votes have been rejected, or illegal votes received, an inquiry should be made as to whether the election truly reflected the voters' will with the *Russell* test as the guide. If not, then a special election must be held.[22]

¶72. Since disqualification of illegal votes is not the dispositive issue in this appeal, we turn our focus squarely on whether the irregularities were substantial enough to warrant a special election. *Russell*, 443 So. 2d at 1198. In *Walker*, we held that this determination "depends upon the facts and circumstances in each particular case, including the nature of the procedural requirements violated, the scope of the violations and the ratio of illegal votes to the total votes cast." 213 Miss. at 264, 57 So. 2d at 167. Accordingly, if the irregularities are due to fraud or willful violations of the election procedure, this Court will not hesitate to order a new election, even though the percentage of illegal votes is small. *Harris*, 193 So. at 346.

¶73. In *Clark v. Rankin County Democratic Executive Committee*, 322 So. 2d 753 (Miss. 1975), we dealt with error wherein election officials substantially deviated from mandatory election day procedure by opening ballot boxes while the election was still in progress. 322 So. 2d at 756. In violating section 23-3-13 of the then-applicable Corrupt Practices Law,

---

[22]Jackson & Miller, *Encyclopedia of Mississippi Law, Election Law*, § 51, at p.111.

which was passed specifically to insure the secrecy of a voter's ballot and to guard against the opportunity for fraud in the counting of the ballots, officials totally departed from mandatory procedure. *Id*. In *Clark* we stated:

> When, as in this case, there has been a total departure from the mandatory provisions of the Corrupt Practices Law with respect to time, manner and conditions under which the ballots were counted, the contestee cannot successfully claim that the contestant has failed to show the will of the electors could not be ascertained or has not shown the existence of fraud in connection with such counting. The departure complained of deprives him of the very means by which the fraud could be detected if any exists.

*Id*. at 757 (citing *Briggs v. Gautier*, 195 Miss. 472, 15 So. 2d 209 (1943)). We likewise stated in *Clark*:

> We have held in a number of cases that where there has been a radical departure from the mandatory provisions of the Corrupt Practices Law the result of the particular precinct or precincts in question is void. *Wallace v. Leggett*, 248 Miss. 121, 158 So.2d 746 (1963); *Ulmer v. Currie*, 245 Miss. 285, 147 So. 2d 286 (1962); *May v. Layton*, 213 Miss. 129, 56 So. 2d 89 (1962); *Briggs v. Gautier*, *supra*; *Harris v. Stewart*, 187 Miss. 489, 193 So. 339 (1940); *Hayes v. Abney*, 186 Miss. 208, 188 So. 533 (1939).

*Id.*

¶74. In this case, the special remedy of a new election ordered by Judge Smith was not only an appropriate remedy, it was the only remedy. The gross deviation and total departure from mandatory election procedure by the HCDEC (via the county election commission) caused the result of the August 5, 2003, election for District Three supervisor to be completely undermined as all indicia of reliability were compromised. Similar to the gross error in *Clark*, a radical departure from statutory mandate occurred when the seals of all six election day

48

boxes for District Three were broken and the contents therein were left exposed. Likewise, the circuit clerk did not take charge of the ballot boxes on election night as required by statute. Accordingly, the evidentiary value of the boxes' contents was completely lost and the ability of the county executive committee, the candidates, and the voting public to detect the existence of voter fraud and/or any other type of impropriety or miscalculations was lost.

¶75. We readily acknowledge that there have been no allegations or proof of fraud by Gnemi against the voters or election officials. While Waters thus maintains that Gnemi's election contest fails due to his failure to claim fraud, it is Gnemi's inability to even be able to detect fraud that mandates today's extraordinary remedy. Like secret vote counting, removal of the ballot boxes and their contents from the secure and prescribed custody of the circuit clerk for sixteen days, during which time the contents were removed, commingled and placed in insecure cardboard boxes, not only prevented Gnemi and objective reviewing bodies from properly ascertaining the accuracy and substance of the result posted on election day, but also prevented any discovery of ballot irregularities or outright fraud in the election. Moreover, Gnemi, in a tightly contested race, has been unable to compare the total number of voted, unvoted and spoiled ballots in each separate precinct or even be certain that they equal the total number of ballots the receiving election manager in a particular precinct swore he received and took to the precinct at the time the polls opened on election day, such being a fundamental check for fraud readily exercised by a candidate in a post-election examination of sealed ballot boxes. Miss. Code Ann. § 23-15-591.

¶76.    In discussing the importance of a box examination, we stated in *Lopez v. Holleman*, 219 Miss. 822, 69 So. 2d 903 (1954), that the right is one "'by which in its main objective the candidate is made a mere instrumentality in the better assurance of an honest, impartial and lawful election.'" 219 Miss. at 836, 69 So.2d at 907 (citing and quoting from *Sartin v. Barlow*, 196 Miss. 159, 16 So.2d 372, 375 (1943)).  In the case sub judice, Gnemi was wholly deprived of his opportunity to utilize fundamental safeguards installed in the mechanism created by the election code.   Accordingly, Judge Smith quite appropriately found that the denial of Gnemi's right to an accurate examination of the ballot boxes mandated a special election.

¶77.    Having found, for the reasons stated, that there were numerous violations of our election laws, we find that the special tribunal properly determined that a special primary election should be conducted; therefore, Issue II, concerning Waters's assertion that the special tribunal committed reversible error in finding such as radical departure from our election laws so as to require a special primary run-off, is without merit.

## CONCLUSION

¶78.    We wish to make abundantly clear that our decision today should in no way be perceived as even inferring intended wrongdoing by the Holmes County election officials.   There is nothing in the record to even suggest that one or more Holmes County election officials acted, or failed to act, with sinister motives or with the intent to hurt or help any particular candidate. The circuit clerk and at least one election commissioner explained there actions or inactions by stating in essence "that was simply the way it had always been done in Holmes County."  We understand this mind-set.   It is quite common that when newly elected officials take office,

50

they rely on the advice of their predecessors and other informed officials in learning how to perform their respective duties. If a newly elected official is told that "this is the way we have always done it", and "it" seems to be a fair way which has been successful in the past, why rock the boat? While we rely on our elected officials to educate themselves on the appropriate laws governing their duties and responsibilities, we acknowledge the fact that our elected officials quite appropriately rely on information gained at seminars, conferences, and from state officials who are charged by law with advising our local elected officials as to how to better perform their duties.

¶79. However, at the end of the day, in the conduct of local, district and state-wide elections, all Mississippi voters have to rely on the experience, expertise and integrity of our election officials to diligently perform their statutorily mandated duties to assure that our elections are fairly and properly conducted. Perhaps, all of this can best be summed up by our admonition in *Riley*:

> Although there is a strong public policy in attempting to preserve the will of the electorate as reflected by the tabulation of all of the votes, we take this opportunity to remind registrars throughout the state that they invite election contests, uncertainty and the opportunity for fraud by failing to pay close heed to the election statutes whether they be mandatory or directive. Any expense or burden such compliance creates is trivial when compared to the value of the goal of maintaining our Republic. Integrity of our government can be no greater than the integrity of elections which put our government officials in office. It is therefore the duty of every registrar to endeavor to comply with the election statutes regardless of the personal inconvenience it may create.

441 So.2d at 1328. We know of nothing else which could be added to our directive in *Riley*.

¶80.    For the reasons herein stated, the decision of the Special Tribunal, Circuit Judge Albert B. Smith, III, presiding, is affirmed.

¶81.    **AFFIRMED.**

**SMITH, C.J., WALLER AND COBB, P.JJ., EASLEY, GRAVES, DICKINSON AND RANDOLPH, JJ., CONCUR. DIAZ, J., NOT PARTICIPATING.**